**No. 25-7760**

**IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

THE ESTATE OF ISABELLA "BELLA" HERNDON;
JOHN HERNDON; J.H., a minor; T.H., a minor;
on behalf of themselves and others similarly situated,

*Plaintiffs-Appellants*,

v.

NETFLIX, INC.,

*Defendant-Appellee*.

On Appeal from the United States District Court
for the Northern District of California
No. 4:21-cv-06561-YGR
Hon. Yvonne Gonzalez Rogers, United States District Judge

# APPELLANTS' OPENING BRIEF

Ryan Hamilton
HAMILTON LAW LLC
8100 W. Sahara Ave., Suite 200
Las Vegas, Nevada 89117
(702) 818-1818
Ryan@HamLegal.com

Andrew Grimm
DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive
Omaha, Nebraska 68154
(531) 210-2381
Andrew.B.Grimm@Gmail.com

Gregory Keenan
DIGITAL JUSTICE FOUNDATION
81 Stewart Street
Floral Park, New York 11001
(516) 633-2633
GWKeenan24@Gmail.com

*Attorneys for Appellants*

## ORAL-ARGUMENT STATEMENT

This is a case about dead children and the failure of a district court to abide its limited jurisdiction.

Here, Defendant Netflix, Inc., used its proprietary algorithms to target some of the most vulnerable children, even after being emphatically warned by its own retained medical experts that its course of action would cause children to die. The breathtaking scope of its data collection permitted Netflix to know which specific children were at high risk.

Netflix took no precautions, however, despite knowing the risks. It didn't even provide a warning about known risks of death.

Netflix could have avoided killing children with two modest tweaks. First, given its knowledge which children were at high risk and given its fine-tuned proprietary algorithmic targeting, Netflix could have avoided targeting those children it knew were at risk of death, while still distributing content to others not at risk. Second, Netflix could have at least warned at-risk children—and their families—of the dangers it knew about and had been warned about. It chose not to. Instead, Netflix proceeded with targeting those children who it knew were specifically vulnerable without providing any warning of known dangers. Scores of children died.

Yet, the essential threshold questions here are federal jurisdiction.

One *California* family sued this *California* defendant over the death of their daughter under *California* law.

Defendant removed. And, the District Court analyzed jurisdiction under, what turned out to be, the wrong complaint. The U.S. Supreme Court remanded to assess jurisdiction in light of the right complaint. So did the Ninth Circuit. The District Court, however, simply stuck to its earlier analysis under the wrong complaint.

The simple truth here is that federal jurisdiction has never been established. There are no federal claims. And, basic questions of diversity jurisdiction have never been answered or established, as is necessary for federal diversity jurisdiction:

**(1) Who is the diverse party?**

**(2) What state are they from?**

**(3) How are they in the case?**

No diversity has been identified. And, there is no diversity in the case. It is, and always has been, a case by ***California*** plaintiffs against a ***California*** defendant under ***California*** law.

This case raises fundamentally important questions of California law: survivor tolling (*i.e.*, whether killing children as opposed to just injuring them limits the time to sue), wrongful-death standing (*i.e.*, whether siblings are

categorically barred from suing about the death of their sister merely because their parents didn't die also); duty of care (*i.e.*, whether California has a special exception to duty of care for the use of technology to kill children after being given dire warnings).

Yet, this Honorable Court should not reach those issues because there is no federal jurisdiction.

Instead, it should vacate the judgment and remand.

Congress knew that figuring out diversity in class-actions would take longer so it specially excused class-action defendants from removing within a one-year timeframe. 28 U.S.C. § 1453(b) (excusing defendants from "the 1-year limitation under section 1446(c)(1)" for class-actions that meet the requirements of 28 U.S.C. § 1332(d)(2)).

The removal here was simply premature.

Accordingly, minimal diversity has never been established. Nor has Article III injury-in-fact. And, so, despite the numerous important issues here, this Honorable Court should do what the Constitution and what Congress have always required when there's no federal jurisdiction: vacate and remand state court, recognizing that if Defendant can later <u>*establish*</u> minimal diversity, it can later remove.

*****

Counsel respectfully submit that this Honorable Court may wish to hold oral argument.

# TABLE OF CONTENTS

**Page**

ORAL-ARGUMENT STATEMENT .......... ii

TABLE OF AUTHORITIES .......... x

JURISDICTIONAL STATEMENT .......... 1

RELEVANT STATUTORY & CONSTITUTIONAL PROVISIONS .......... 2

STATEMENT OF ISSUES .......... 3

I. FEDERAL JURISDICTION .......... 3

II. SURVIVAL AND WRONGFUL-DEATH .......... 6

III. DUTY AND PRODUCTS-LIABILITY .......... 7

STATEMENT OF THE CASE .......... 8

I. URGENT WARNINGS THAT CHILDREN WOULD DIE .......... 11

II. BELLA HERNDON AND OTHER CHILDREN DID DIE. .......... 12

III. LITIGATION HISTORY AND COURT PROCEEDINGS .......... 13

SUMMARY OF ARGUMENT .......... 15

STANDARD OF REVIEW .......... 18

ARGUMENT .......... 19

I. THE DISTRICT COURT ERRED BELOW BY FAILING TO ESTABLISH SUBJECT-MATTER JURISDICTION. .......... 19

A. The District Court failed to establish minimal diversity in this case. .......... 23

i. The District Court acknowledged that there's no diversity of citizenship among the named Parties to this action. ....23

ii. The District Court acknowledged below that it had considered diversity under the wrong complaint but then stuck to its prior analysis under the wrong complaint. ....24

iii. Diversity jurisdiction isn't established when there's been no identification of a diverse person, of their status as a class member, or of their citizenship at the time of filing. ....31

iv. Moreover, the statute and the Constitution require the case to be diverse, such that there must be a minimally diverse person in the case. ....43

B. The District Court erred in refusing to remand under §1332(d)(4) (or §1332(d)(3)) and, alternatively, erred in refusing to permit jurisdictional discovery by analyzing the wrong complaint. ....46

i. The District Court erred in refusing to apply the amended complaint which specifically demonstrates all elements required to remand. ....46

ii. The District Court erred by re-adopting, even after *Royal Canin*, its prior position on jurisdictional discovery that was based upon the wrong complaint. ....51

iii. Under the correct standards, jurisdictional discovery should've been permitted. ....52

C. The District Court failed to consider in any respect its Article III jurisdiction. ....56

i. Article III jurisdiction was entirely disregarded below, despite repeated requests. ....56

ii. Article III injury-in-fact isn't met for the Plaintiffs on this record. ....57

iii. On this record, Article III injury-in-fact isn't met for any diverse class-member whose injury-in-fact would be necessary to sustain diversity jurisdiction. ...............................60

II. THE DISTRICT COURT ERRED ON SURVIVAL LIMITATIONS AND WRONGFUL-DEATH STANDING. .........................................................62

A. RULE OF DECISION ACT: California state case law governs for all merits issues in this case..................................62

B. SURVIVAL LIMITATIONS: The District Court erred in holding that Bella's death shortened the time to assert her survival claims. ...................................................................63

i. Bella Herndon's survival claims are timely under §366.1.........................................................................................63

ii. The District Court found otherwise by overlooking §366.1.........................................................................................64

iii. California has not imposed any restriction on tolling under §366.1............................................................................66

iv. The California law confirms that tolling in CCPC Chapter 4 applies to limitations periods in Chapter 3...............68

C. WRONGFUL-DEATH STANDING: The District Court erred in holding that rules of intestate succession bar wrongful-death claims by Bella's brothers...............................70

i. The California Supreme Court has confirmed that the common-law canons of descent govern for statutory standing to assert a wrongful-death action. ..............................70

ii. The District Court decided otherwise by overlooking the California Supreme Court's authorities and citing cases that did not decide the issue...................................................75

III. THE DISTRICT COURT ERRED ON DUTY OF CARE AND PRODUCTS LIABILITY.........................................................................................77

A. Given that amendment was preserved, the Court could simply remand rather than address additional issues. ....77

B. The District Court erred on California duty-of-care by excusing a foreseeable, and foreseen, risk of death. ....79

iii. Special-relationship duty ....79

iv. Ordinary duty ....79

v. No *Rowland* exception ....81

vi. Statutory duty ....82

C. The District Court erred on products liability because software can be a product under California law. ....84

CONCLUSION ....89

STATEMENT OF RELATED CASES ....91

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ....92

CERTIFICATE OF SERVICE ....93

# TABLE OF AUTHORITIES[1]

**Page(s)**

**Cases**

Ahanchian v. Xenon Pictures, Inc.,
624 F.3d 1253 (2009). ....28

Baral v. Schnitt,
1 Cal. 5th 376 (2016). ....60

Bender v. Williamsport Area Sch. Dist.,
475 U.S. 534 (1986). ....1

Bonni v. St. Joseph Health System,
11 Cal. 5th 995 (2021). .... 59, 60

Borden v. eFinancial, LLC,
53 F.4th 1230 (9th Cir. 2022). ....28

Burgos v. Tamulonis,
28 Cal. App. 4th 757 (1994). ....34

Burk v. Arcata & M. R. R. Co.,
125 Cal. 364 (1899). ....38

Cox v. Heath,
198 N.C. 503 (1930). ....39

Estate of Ryan,
21 Cal. 2d 498 (1943). ....38

FilmOn.com Inc. v. DoubleVerify Inc.,
7 Cal. 5th 133 (2019). .... 72, 73, 74, 75

Flatley v. Mauro,
39 Cal. 4th 299 (2006). ....81

---

[1] Emphasis is added unless otherwise indicated.

The California Code of Civil Procedure – *i.e.*, Cal. Civ. Proc. Code – is abbreviated as "CCPC."

References to 28 U.S.C. § 1332 are abbreviated to "§1332."

Geiser v. Kuhns,
13 Cal. 5th 1238 (2022). ....................................................................71

Gonzalez v. Google LLC,
2 F.4th 871 (2021). .................................................................................... ii

Grant v. McAuliffe,
41 Cal. 2d 859 (1953). ..............................................................................29

Hamilton v. Wal-Mart Stores, Inc.,
39 F.4th 575 (9th Cir. 2022). ....................................................................81

Hoffmann v. Pulido,
928 F.3d 1147 (9th Cir. 2019). ....................................................................1

Howell v. Budd,
91 Cal. 342 (1891). ....................................................................................38

In re Steele, 32 Cal. 4th 682 (2004). .........................................................41

J.B. Painting & Waterproofing, Inc. v. RGB Holdings, LLC,
650 F. App'x 450 (9th Cir. 2016). ............................................................43

Jacoves v. United Merchandising Corp.,
9 Cal. App. 4th 88 (1992). ................................................................. 78, 79

La Liberte v. Reid,
966 F.3d 79 (2020). ..................................................................................83

Latch v. United States,
842 F.2d 1031 (9th Cir. 1988). ....................................................................1

Lickter v. Lickter,
189 Cal. App. 4th 712 (2010). ..................................................................30

Lowell v. Kier,
50 Cal. 646 (1875). ....................................................................................31

Makaeff v. Trump Univ., LLC,
736 F.3d 1180 (2013). ..............................................................................82

Miklosy v. Regents of University of California,
44 Cal. 4th 876 (2008). .............................................................................40

Munro v. Pacific Coast Dredging & Reclamation Co.,
84 Cal. 515 (1890). ....................................................................................29

Norris v. Hensley,
27 Cal. 439 (1865). ....................................................................39

Park v. Board of Trustees,
2 Cal. 5th 1057 (2017). ....................................................... 59, 60

Price v. Stossel,
620 F.3d 992 (9th Cir. 2010). ...........................................................28

Redfield v. Oakland C. S. R. Co.,
110 Cal. 277 (1895). ............................................................ 36, 37

Reich v. Purcell,
67 Cal. 2d 551 (1967). ........................................................................33

Rutherford v. Owens-Illinois, Inc.,
16 Cal. 4th 953 (1997). ........................................................................78

Safari Club Int'l v. Rudolph,
862 F.3d 1113 (9th Cir. 2017). ...........................................................80

Sakamoto v. Duty Free Shoppers, Ltd.,
764 F.2d 1285 (9th Cir. 1985). ...........................................................80

Segal v. ASICS America Corp.,
12 Cal. 5th 651 (2022). ........................................................................41

United States ex rel. Newsham v. Lockheed Missiles & Space Co.,
190 F.3d 963 (9th Cir. 1999). ................................. 57, 58, 81, 82, 83

Wilbanks v. Wolk,
121 Cal. App. 4th 883 (2004). ...........................................................57

Wilcox v. Superior Court,
27 Cal. App. 4th 809 (1994). .............................................................57

Wilson v. CNN,
7 Cal. 5th 871 (2019). ........................................ 60, 71, 72, 73, 75

World Fin. Grp., Inc. v. HBW Ins. & Fin. Servs., Inc.,
172 Cal. App. 4th 1561 (2009). ..........................................................75

Young v. Haines,
41 Cal. 3d 883 (1986). ........................................................................34

**Statutes**

17 U.S.C. § 505. ..........................................................................................82

28 U.S.C. § 1332(d). ....................................................................................1

42 U.S.C. § 1988. ....................................................................................82

47 U.S.C. § 230. ....................................................................................ii

Cal. Age-Appropriate Design Act §  1798.99.31. ....................................................62

Cal. Age-Appropriate Design Act § 1798.99.30. ....................................................62

Cal. Civ. Proc. Code § 335.1. .................................................................... 30, 32, 33

Cal. Civ. Proc. Code § 340.5. ....................................................................32

Cal. Civ. Proc. Code § 352. .................................................................... 29, 32, 33

Cal. Civ. Proc. Code § 366.1. ............................................ 3, 29, 30, 31, 32, 33, 34

Cal. Civ. Proc. Code § 366.2. ....................................................................32

Cal. Civ. Proc. Code § 377.20. .................................................................... 29, 34

Cal. Civ. Proc. Code § 377.30. ....................................................................30

Cal. Civ. Proc. Code § 377.60. ....................................................................4, 9

Cal. Civ. Proc. Code § 425.16. .................................... 6, 58, 59, 60, 71, 73, 74, 81

**Other Authorities**

"Using 'Big Data' To Reduce and Prevent Self-Harm and Suicide,"
Swansea University (last accessed Jan. 3, 2023)..........................................19

Amatriain, Xavier, Big & Personal: Data and Models Behind Netflix Recommendations, Proceedings of the 2d Int'l Workshop on Big Data (2013)........................................................................................ iv

Charles Duhigg, "How Companies Learn Your Secrets,"
The New York Times Magazine (Feb. 16, 2012)..........................................19

Madelyn S. Gould & Alison M. Lake, "The Contagion of Suicidal Behavior," National Academy of Sciences (2013). ......................................20

Marnie Eisenstadt, "'13 Reasons Why' is a hit, but suicide expert told Netflix not to release series,"
Syracuse.com (Apr. 26, 2017)..................................................................21

Sophie Gilbert, What Went Wrong With 13 Reasons Why?,
The Atlantic (May 4, 2017). ..................................................................21

Statement of Frances Haugen, U.S. Senate Committee on Commerce, Science and Transportation (Oct. 4, 2021). ....................22

U.S. Cons. Art. III, § 2. ....................1

Zara Adams, "Why Young Brains Are Especially Vulnerable to Social Media," American Psychological Association (Aug. 25, 2022). ....................19

**Rules**

Fed. R. Civ. P. 11 (1983). ....................82

## JURISDICTIONAL STATEMENT

(A) This class-action was asserted by ***California*** plaintiffs against a ***California*** defendant in ***California*** state court under ***California*** law. 3-ER-518 (operative complaint); 4-ER-652 (initial complaint). There is *no diversity* of citizenship here. There are *no federal claims*. The District Court did ***not*** have jurisdiction. See Section I, *infra*.

(B) Judgment was entered below. 1-ER-2. This Court has jurisdiction. 28 U.S.C. § 1291.

(C) This appeal was noticed 14 days after the entry of judgment. 4-ER-761.

(D) This appeal is from a final order and judgment.

## RELEVANT STATUTORY & CONSTITUTIONAL PROVISIONS

The relevant Constitutional and statutory provisions are:

- U.S. Const. art. III, § 2.
- 28 U.S.C. § 1332.
- Cal. Civ. Proc. Code § 366.1.
- Cal. Civ. Proc. Code § 377.60.

## STATEMENT OF ISSUES

### I. FEDERAL JURISDICTION

A. *Diversity*: Whether there's diversity jurisdiction:

i. Whether there's complete diversity. **No, and undisputed.**

ii. Whether "prior analysis" that analyzed the wrong complaint established diversity. **No.**

iii. Whether the District Court is correct that class definition not being restricted to one state removes the minimal-diversity requirement. **No.**

iv. Whether the District Court's exercise of diversity jurisdiction is consistent Article III's diversity requirement. **No.**

B. *§1332(d)(3)-(4) & Discovery*: Whether §1332(d)(3)-(4)'s exceptions are met and/or whether jurisdictional discovery should've been permitted:

i. Whether class-composition allegations whose veracity is unchallenged can meet the §1332(d)(3)-(4) exceptions. **Yes.**

ii. Whether the District Court should've analyzed the correct complaint when considering jurisdictional discovery. **Yes.**

iii. Whether the District Court should've permitted jurisdictional discovery that would require 5-10 minutes of time by an entry-level employee to obtain, is exclusively in the possession of the Defendant, and, is necessary to ensure that a mandatory Congressional determination that certain cases should not be in federal court is not wholly stymied. **Yes.**

C. *Article III injury-in-fact*: Whether there's Article III injury-in-fact on this record:

i. Whether the District Court erred in repeatedly refusing to consider Article III injury-in-fact. **Yes.**

ii. Whether Article III injury-in-fact requires a showing, not made here, of an injury personal to the party plaintiff and cognizable under common law. **Yes.**

iii. Whether Article III injury-in-fact must be shown for all persons upon whom diversity jurisdiction is predicated. **Yes.**

## II. SURVIVAL AND WRONGFUL-DEATH

A. *Rules of Decision Act*: Do California Supreme Court interpretations of California law control? **Yes.**

B. *Survival Limitations*: Does CCPC§366.1 prevent death from shortening the time to sue? **Yes.**

C. *Wrongful-Death Standing*: Does California apply the common-law canons of descent to decide wrongful-death standing? **Yes.**

## III. DUTY AND PRODUCTS-LIABILITY

A. *Amendment*: If this Court reverses on wrongful-death standing or survival limitations, should it remand for amendment? **Yes.**

B. *California Duty of Care*: Did Defendant owe a duty of care? **Yes.**

C. *California Products Liability*: Was Defendant providing a product under the Greenman-Escola test? **Yes.**

## STATEMENT OF THE CASE

Netflix is a self-described "pioneer" in the technology used to manipulate what its viewers watch. 4-ER-556; 3-ER-346. It spends over a billion dollars annually on this technology. 3-ER-368; 4-ER-580. In 2014 alone, it spent over $150 million employing over 300 technologists just to maintain and improve this technology.[2,3]

This technology permits Netflix to manipulate and control what its viewers watch on its platforms. In its own words, 75% of viewing decisions by users on its platform are driven and controlled by it:




3-ER-533.

And, that 75% figure is for the general population—not for impressionable children, the audience at issue here.

[2] These footnote materials are susceptible to judicial notice.

[3] Janko Roettgers, "Netflix Spends $150 Million on Content Recommendations Every Year," Yahoo!News (Oct. 9, 2014).

Netflix's co-CEO calls this technology "*personalization*."[4] That's a euphemism. What is really meant by "personalization" is three things: **(1)** Netflix tracks and knows everything a user does on its platform; **(2)** Netflix processes this information to know the user intimately, down to that user's "interests and *moods* and "demographics, location, language, or temporal data;" and **(3)** Netflix then dramatically modulates its presentation of its online platform to manipulate its users decisions on the platform to such a degree, and with constantly refined precision, that it actively controls "***75%***" of what its users view on its online platform. 3-ER-533.

Netflix has a goal to "personalize as much of the experience as possible"[5] and a saying "Your Netflix is not my Netflix"[6] Euphemisms aside, this means Netflix wants to exercise as much influence over what its users watch as possible. Its technology makes this possible. It doesn't spend over a billion dollars annually on this technology for nothing. As of 2013, it succeeded in choosing, *i.e.*, controlling what's watched 75% of the time.

*****

[4] Josef Adalian, "Inside the Binge Factory," New York Magazine (June 2018).

[5] Id. at 2.

[6] Adalian, "Binge Factory."

Here, Netflix used that technology to force a teenage girl to do something that it had been warned would cause her death. Specifically, Netflix was warned by its own retained medical experts that certain planned activities would cause death among highly vulnerable children. 3-ER-525-526. Netflix didn't heed these warnings and instead deployed its algorithms to manipulate children into taking actions that it knew would aggravate serious health conditions and lead to death. 3-ER-531-542.

Yet, Netflix did it anyway. Scores of children died. One of those children who died is Bella Herndon, the daughter and sister of Plaintiffs here. 3-ER-534-535.

## I. URGENT WARNINGS THAT CHILDREN WOULD DIE

When the show 13 Reasons Why was in production, Defendant consulted mental-health experts. 3-ER-525¶27-526¶31. These medical experts warned Netflix that doing what it intended with its technology would kill children. 3-ER-525¶28-526¶29.

Despite these warnings of death by its own medical experts, 3-ER-525¶¶27, 3-ER-526¶32, Netflix specifically targeted children who it knew were at risk of death by suicide into watching it and used its platform to manipulate those children into watching the show they otherwise wouldn't have. 3-ER-531¶55, 3-ER-533¶64.

For those skeptical that online platforms can actually cause children to die, it's worthwhile to read the full Senate testimony of Facebook whistleblower Frances Haugen. Statement of Frances Haugen, U.S. Senate Committee on Commerce, Science & Transportation (Oct. 4, 2021) (discussing how algorithms can manipulate children into "generating self-harm and self-hate"). It's no longer seriously disputed that online platforms can knowingly cause and direct children to suffer injury and die.[7]

[7] Cf. https://www.npr.org/sections/shots-health-news/2025/09/19/nx-s1-5545749/ai-chatbots-safety-openai-meta-characterai-teens-suicide.

## II. BELLA HERNDON AND OTHER CHILDREN DID DIE.

Netflix targeted 15-year-old Bella Herndon and directed her via technologies aimed at manipulation and control her into taking actions it knew would end in her death. Netflix recklessly disregarded its expert's advice. It targeted Bella Herndon without giving her or her family any warning of a risk of death it knew about. As a result, she died.

### III. LITIGATION HISTORY AND COURT PROCEEDINGS

After Bella's death, the Herndons tried to discuss changes to avoid harms to children with Netflix. Netflix never met with them.

The Herndons sued. 4-ER-652. The gravamen of their suit is that two modest tweaks could have avoided foreseeable harm. First, Netflix could've avoided compelling Bella to do what it knew would kill her. 4-ER-672-674. Second, Netflix could have warned Bella and her family about the risks of death. 4-ER-671-672.

Netflix removed. 3-ER-546-551. The Parties disputed federal jurisdiction. 2-ER-247; 2-ER-253; 2-ER-321; 3-ER-478. The District Court denied remand, analyzing the incorrect complaint and nowhere analyzing its Article III injury-in-fact. 1-ER-38.

Then, the Parties briefed Defendant's Rule 12(b)(6) motion. 2-ER-183; 2-ER-209; 3-ER-441. The District Court held a hearing, 2-ER-171-189, granted the motion, 1-ER-14-19, and entered judgment, 1-ER-13. After entry, Netflix made clear that it intends to seek ruinous fees (in the millions) against a grieving family. See 2-ER-162.

Plaintiffs appealed. 2-ER-157.

This Court affirmed, but its memorandum didn't address original federal jurisdiction. 2-ER-149.

The Supreme Court vacated the judgment and remanded in light of Royal Canin, U.S.A. v. Wullschleger, 604 U.S. 22 (2025). 2-ER-146. This Court further remanded. 2-ER-144.

After remand, the District Court stuck to its "prior analysis" under the incorrect complaint and "assumed" that Royal Canin was not irreconcilable with prior Circuit precedent. 1-ER-4-11. Despite requests, it nowhere considered Article III.

## SUMMARY OF ARGUMENT

I. *Jurisdiction & Jurisdictional Discovery*: The District Court held that there was minimal diversity below, but did so by analyzing the incorrect complaint and sticking to its "prior analysis" under the wrong complaint even after the Supreme Court and this Court remanded to consider the correct complaint. It refused to engage the operative class-definitions and refused to abide, or even consider, Article III's diversity requirement. This is a case where *Californians* sued a *Californian*. That's not diversity – and plainly so. Moreover, the District Court also predicated its refusal to remand under the §1332(d)(3)-(4) jurisdictional exceptions upon the prior analysis of the *wrong* complaint, refused to credit allegations whose veracity was unchallenged, and, then, stymied even modest discovery rendering contrary to Congress' determination that certain classes don't belong in federal court, again, based upon analysis under the wrong complaint. Then, despite repeated requests to consider Article III injury-in-fact, , the District Court simply refused to consider this Constitutional requirement. Jurisdictional rule after jurisdictional rule have not been abided. Jurisdiction is not optional. It must be established. Despite years of litigation, the basic questions of diversity are unanswered: *Who is the diverse person? What State are they from? How are they in this case at present*?

II. *Limitations & Statutory Standing*: Below, the District Court overlooked the operative statutes and ignored California Supreme Court authority. Yet, under the Rules of Decision Act, California Supreme Court cases are controlling. For the survival statute, the California Supreme Court has repeatedly instructed that death cannot shorten the time to sue – so the District Court's contrary conclusion should be reversed. For wrongful-death standing, the California Supreme Court held that the common law determines standing to sue and, under common law, Bella's brothers have such standing. The District Court thought otherwise by overlooking the California Supreme Court's authority.

III. *Duty and Products Liability*: This Court need not address these issues because Plaintiffs have preserved a right to amend. Yet, on duty, there's plainly a duty to avoid foreseeable injury – and given the foreseeability and specific forewarning of harms here, there is no compelling basis for an exception to duty under the Rowland factors. Indeed, given its level of supervision, control and the vulnerability of the decedent, Defendant owed a special-relationship duty as to activities on its platform. Moreover, the algorithmic software here is a product under the governing Greenman-Escola test – a test that's plainly met here but that the District Court simply ignored.

## STANDARD OF REVIEW

All issues herein are reviewed **de novo**. E.g., Abrego, 443 F.3d at 679 (9th Cir.) ("**remand order**"); Pub. Int. Legal Found., Inc. v. Nago, 174 F.4th 664, 670 (9th Cir. 2026) ("**Article III jurisdiction**"); Borden v. eFinancial, LLC, 53 F.4th 1230, 1232 (9th Cir. 2022) ("**motion to dismiss**"); Stevens v. Corelogic, Inc., 899 F.3d 666, 677 (9th Cir. 2018) ("**denial of discovery**" if failure to exercise substantive discretion); Ahanchian v. Xenon Pictures, Inc., 624 F.3d 1253, 1258 (9th Cir. 2009) (similar); Salve Regina Coll. v. Russell, 499 U.S. 225, 231 (1991) ("**determination of state law**").

## ARGUMENT

### I. THE DISTRICT COURT ERRED BELOW BY FAILING TO ESTABLISH SUBJECT-MATTER JURISDICTION.

"State-law claims are usually brought in state court." Berk v. Choy, 607 U.S. 187, 191 (2026).

That's because federal courts are "courts of ***limited jurisdiction***." Royal Canin U.S.A., Inc. v. Wullschleger, 604 U.S. 22, 26 (2025); Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 374 (1978) ("*fundamental precept* that federal courts are courts of *limited jurisdiction*"). And, appellate courts play the key role in ensuring that jurisdictional limits are "*neither disregarded nor evaded*." Owen, 437 U.S. at 374.

This Court has "inherent authority" to correct erroneous exercise of below. E.g., Hoffmann v. Pulido, 928 F.3d 1147, 1151 (9th Cir. 2019). That's this Court's "***special obligation***":

> [E]very federal **appellate** court has a **special obligation** to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review[.]

Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986).

If a district court fails to firmly establish its jurisdiction over a case, then this Court "***must*** *vacate*." E.g., Latch v. United States, 842 F.2d 1031, 1033 (9th Cir. 1988).

This "inflexible" must-vacate rule stems from the fact that jurisdiction is authority to decide, *i.e.* "power to declare the law." See Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 577 (1999). Thus, jurisdiction is a "***threshold***" issue. Ruhrgas, 526 U.S. at 577. Without establishing jurisdiction, any merits decision would be "**a nonbinding advisory opinion at best and an *ultra vires* act at worst.**" E.g., J.A. Masters Invs. v. Beltramini, 117 F.4th 321, 323-324 (5th Cir. 2024).

*****

Below, jurisdiction has never been established.

Here, *California* plaintiffs sued a *California* defendant under *California* law. There are *no federal claims*. See 28 U.S.C. § 1331. Instead, the District Court looked to the "the diversity statute[.]" See Chicago v. Int'l Coll. Surgeons, 522 U.S. 156, 169 (1997).

Yet, the District Court *never* identified a minimally-diverse person, *never* identified such person's state of *citizenship* (their domicile, or even their residency), *initially* analyzed the *incorrect complaint* and then, after the U.S. Supreme Court remanded to address the correct complaint, the District Court simply stuck with its "prior analysis" under the wrong complaint, wholly ignoring the operative class-definitions.

It *never* addressed how there's diversity *in this case*, given that those party to this case are solely *Californians* suing another *Californian* – with no diverse person having ever been identified, joined, or in any matter added to the proceedings, as is required to have even minimal diversity under the statute and the Constitution. See Section I.A, *infra*.

Furthermore, there are mandatory exceptions to minimal-diversity jurisdiction. §1332(d)(4)(A)-(B). All elements for these exceptions are plainly met. The District Court simply refused to accept the pertinent allegation which went unchallenged below. That's error.

Compounding this error, the District Court refused to permit *any* jurisdictional discovery to permit Plaintiffs to prove their allegation, so, rendered it impossible for Plaintiffs to prove the allegation true – using procedure to override mandatory exceptions to jurisdiction under §1332(d)(4). *Initially*, the District Court refused to permit jurisdictional discovery by analyzing the *incorrect complaint*. *Then*, on remand, it simply stuck with its earlier decision under the wrong complaint.

This necessary information is exclusively in Defendant's possession. This information would be "extremely easy" to provide because an "entry-level" employee could do so with "5 to 10 minutes" of his time. 2-ER-64-70.

Yet, because this modest request was "*disregarded [and] evaded*," see Owen, 437 U.S. at 374, as was a clear exception to diversity jurisdiction that Congress wanted applied as *mandatory*, this Court should reverse. See Section I.B., *infra*.

Moreover, Plaintiffs repeatedly asked the District Court to consider Article III. That never happened. The District Court has *never* addressed this irreducible Constitutional minimum at all. And, ultimately, the record cannot sustain Article III injury-in-fact because, under the Supreme Court's Article III jurisprudence, the record does not indicate any injury-in-fact to any person here, neither named Plaintiffs nor anyone else. See Section I.C, *infra*.

*****

Without mentioning Article III's requirements, without accepting allegations on class composition or permitting even the most modest of discovery to address Congress' mandatory exceptions to jurisdiction, without ever establishing even minimal diversity, and without ever analyzing the class definitions provided in the correct complaint, the District Court just proceeded to the merits. Even one of these errors is sufficient to warrant vacating the judgment. Together, they betray a profound failure to abide Constitutional and Congressional limitations on federal jurisdiction.

This Honorable Court should correct these errors.

### A. The District Court failed to establish minimal diversity in this case.

The District Court erred below because there's simply no diversity in this case at present. There's no diversity among the Parties and no identified diversity among the class, such that this case by *Californians* against a *Californian* is plainly not a "Case […] between Citizens of different States" at present. U.S. Const. art. III, § 2.

#### i. The District Court acknowledged that there's no diversity of citizenship among the named Parties to this action.

Firstoff, it's worth noting what's common ground, *i.e.*, what the District Court acknowledged and what Defendant conceded. Specifically, there's no dispute as to "***complete diversity***" here because there's "a single plaintiff from the same State as a single defendant[.]" E.g., Abrego, 443 F.3d at 679 (9th Cir. 2006). *All the Parties are California citizens.*

Here, Plaintiffs are ***Californians***. 3-ER-522¶9. Defendant is a ***Californian***. 3-ER-549¶6, Given that these are *all* Parties to this suit at present, there's no diversity of any kind in suit. Defendant's conceded the point, never disputing it. 3-ER-419-440. And, the District Court expressly acknowledged that there's "no dispute here that [Defendant] and the named plaintiffs are ***not diverse***." 1-ER-45.

ii. The District Court acknowledged below that it had considered diversity under the wrong complaint but then stuck to its prior analysis under the wrong complaint.

The District Court initially conducted its jurisdictional analysis based upon the incorrect complaint. Later, after the U.S. Supreme Court remanded with instructions to assess whether it had analyzed the correct complaint given the intervening Royal Canin decision, the District Court simply stuck by its "prior analysis" – and *never explained how minimal diversity was met under the amended complaint*.

*****

After removal, Plaintiffs amended. 3-ER-518-545. Yet, applying then-governing Ninth Circuit law, the District Court analyzed jurisdiction under the *initial* complaint, not the *amended* complaint. 1-ER-42.

Later, the Supreme Court decided Royal Canin, 604 U.S. 22 (2025), making apparent that the District Court had analyzed the wrong complaint: "***When a plaintiff amends her complaint following her suit's removal, a federal court's jurisdiction depends on what the new complaint says.***" Id. at 30, 35 ("***[T]he new pleading 'supersedes' the old one: The 'original pleading no longer performs any function in the case.***'"). And, the Supreme Court vacated and remanded in this very case with instructions to consider Royal Canin's effect. No. 24-434 (U.S.) (Feb. 25, 2025).

In turn, this Honorable Court further remanded the case to the District Court with instructions to consider Royal Canin's effect upon federal jurisdiction. 2-ER-144.

Then, the District Court simply ***assumed*** that Royal Canin and prior Circuit precedent, Broadway Grill were not "clearly irreconcilable." 1-ER-12 n.5 ("The Court assumes without deciding that Broadway Grill is not 'clearly irreconcilable' with Royal Canin.").

That assumption was wrong.

This Honorable Court's been abundantly clear: "**Royal Canin overruled our prior precedent** holding that post-removal amendments do not undermine federal jurisdiction[.]" Faulk v. JELD-WEN, 159 F.4th 618, 620 (9th Cir. 2025); Walker, 158 F.4th 971, 980 (9th Cir. 2025) ("**Royal Canin abrogated our precedent.**").

Royal Canin overruled Broadway Grill because that precedent was "**clearly irreconcilable**" with Royal Canin in the key respect relevant here. Faulk, 159 F.4th at 623-624 ("'*clearly irreconcilable* with the reasoning or theory of' Royal Canin. […] Royal Canin overrules our precedent holding that federal jurisdiction is based on the complaint at the time of removal."); id. ("Some of Broadway Grill's dicta and holdings ***irreconcilably conflict*** with Royal Canin.").

Because the District Court "assum[ed]" that Broadway Grill wasn't "clearly irreconcilable" with Royal Canin on which complaint to consider and because this Court has now held otherwise, the District Court should be reversed.

*****

There are ***three*** significant implications of the Royal Canin's outcome to this case.

***First***, Royal Canin requires that a jurisdictional analysis be conducted upon the amended complaint.

Per Royal Canin, "***a federal court's jurisdiction depends on what the new complaint says.***" 604 U.S. at 30. Yet, the District Court's initial analysis was based on the "***original*** Complaint" – not the amended complaint. 1-ER-42. Thus, the District Court's prior analysis could not hold.

When the District Court rested its decision upon its "***prior analysis***" despite remand from the Supreme Court after Royal Canin, that's plainly error. 1-ER-9 ("The Court's ***prior analysis***, which found that plaintiffs plausibly alleged minimal diversity, ***holds***.").

***Second***, the amended complaint affected *who* could possibly be minimally-diverse persons.

Under §1332(d), minimal diversity is only possible for those persons who fall within the ***class definition***. Id. §1332(d)(2)(A) (must be a minimally diverse "member of the class"); id. §1332(d)(1)(D) ("class members" must fit within class "***definition***"); Floyd v. Am. Honda Motor Co., 966 F.3d 1027, 1033 (9th Cir. 2020) (minimally diverse person must fall "within the ***definition*** of the proposed or certified class").

The amended complaint has two class definitions. 3-ER-538¶76a-¶76b. The *first* class plainly cannot supply minimal diversity, *and definitionally so*. That's because the first class is restricted to "ascertainable ***California citizens***[.]" 3-ER-538¶76a. Thus, there cannot possibly be minimal diversity under the first class definition.

The *second* class definition defines the class as "***ascertainable beneficiaries***" of "***decedents***":

> All **[1]** ***ascertainable*** **[2]** ***beneficiaries*** (or their equivalents such as those otherwise legally entitled or with standing to bring claims for wrongful death or an equivalent under their state or national laws) **[3]** ***of decedents*** **[4]** *who watched Netflix's Show*, in full or in part, and died ***as a result*** of Netflix's failure to adequately warn and/or as a result of being negligently targeted and manipulated by Netflix (or its streaming and content-delivery products) to watch the Show.

3-ER-538¶76b.

Thus, to predicate minimal diversity for a person upon this second class definition, the following ***five showings*** are necessary to demonstrate that the person was within the class definition and minimally diverse:

1. That the person was "***ascertainable***."

2. That the person is a "***beneficiar[y]***."

3. That the person is a beneficiary of someone who *died*, *i.e.*, a "***decedent***"

4. That the decedent died "***as a result***" of Defendant's conduct here.

5. That the ***beneficiary was minimally diverse at the time the complaint was filed***. Royal Canin, 604 U.S. at 38 n.8 ("time-of-filing rule applying to citizenship"); §1332(d)(7).

3-ER-538¶76b.

***Third***, the District Court's analysis does not make this showing and, so, under the amended complaint it did not have minimal diversity or subject-matter jurisdiction.

The sum total of the District Court's analysis of minimal diversity is shown at **1-ER-45** and **1-ER-9-10**.

Yet, because the District Court decided to simply reiterate upon its "prior analysis" (1-ER-9) under the original complaint, the District Court nowhere identified someone who meets all these criteria *in the class definition* that are necessary to establish minimal diversity.

Phrased as questions, it's plain that the District Court's "prior analysis" and order upon remand don't answer what must be answered in order for the District Court to have exercised jurisdiction over the case:

***Who died?*** (Because the injury class is restricted to Californians, and the death class definition is restricted to beneficiaries of "***decedents***." So, the District Court's focus on simple *injuries* establish minimal diversity unless it shows that those injuries resulted in death).

***Who's the beneficiary of that decedent?*** (Because the *second* class definition is restricted to legal beneficiaries. But the District Court's analysis says nothing about legal beneficiaries at all. 1-ER-9-10.)

***How is this specific beneficiary ascertainable?*** (Because the *second* class definition requires a showing that they are "ascertainable" and the District Court's analysis says nothing about that. 1-ER-9-10.)

***What was the beneficiary's domicile (i.e., citizenship) in 2021 (when the complaint was filed***)? (Because the District Court's analysis focuses on the place of *injury* years earlier, but the crucial question is the State of domicile in 2021 when the complaint was filed).

Plainly, the District Court's analysis did not establish minimal diversity under the class definition. It didn't even discuss a *decedent*, didn't discuss the *beneficiary*, didn't discuss whether and how that person could be ascertained, and didn't discuss *domicile*, *i.e.*, the state of ***citizenship***, at the time of filing – instead focusing on place of injury.

The District Court simply rested upon its "prior analysis" under the incorrect complaint, even though the Supreme Court and the Ninth Circuit remanded to consider the correct complaint. The "prior analysis" is simply a refusal to do what the Supreme Court's remand order made clear should happen. And, this Court has a "***special obligation***" to ensure jurisdictional limitations are abided. Bender, 475 U.S. at 541. Where they aren't, this Court "***must** vacate*." Latch, 842 F.2d at 1033 (9th Cir.).

iii. Diversity jurisdiction isn't established when there's been no identification of a diverse person, of their status as a class member, or of their citizenship at the time of filing.

The failure to demonstrate minimal diversity on the basis of a class member of the amended complaint is enough to vacate and remand. See Section I.A.ii, *supra*. Yet, the District Court's analysis further transgressed fundamental principles of federal diversity jurisdiction.

There are three key principles.

***First***, it's well-established that the party invoking federal jurisdiction (Defendant here) bears the burden to establish jurisdiction. E.g., Abrego, 443 F.3d at 683 ("We therefore hold that under CAFA the burden of establishing removal jurisdiction remains, as before, on the proponent of federal jurisdiction."); Serrano v. 180 Connect, Inc., 478 F.3d 1018, 1021 (9th Cir. 2007) (same); Blockbuster, Inc. v. Galeno, 472 F.3d 53, 57-58 (2d Cir. 2006) ("well-settled that the party asserting federal jurisdiction bears the burden of establishing jurisdiction"). It's ***not*** the burden of the party brought to federal court (Plaintiffs) to refute it. E.g., Lincoln Prop. Co. v. Roche, 546 U.S. 81, 84 (2005) ("not incumbent […] to negate a potential" party).

***Second***, meeting this burden *requires* Defendant to specifically identify **(1)** a diverse person *and* **(2)** their diverse citizenship at time-of-filing.

Defendant must establish that the parties are "***in fact***" diverse – not just "***arguably so***." E.g., Venezuela v. Helmerich & Payne Int'l Drilling Co., 581 U.S. 170, 184 (2017) ("***Where jurisdiction depends on diversity of citizenship, for example, courts will look to see whether the parties are in fact diverse, not simply whether they are arguably so.***"); Navarro, 446 U.S. 458, 460-461 (1980) ("the 'citizens' upon whose diversity a [party] grounds jurisdiction ***must be real and substantial parties to the controversy***"). The diverse person's identity and domicile must "***affirmatively appear in the record***" and not merely be "**inferred argumentatively**:"

> The rule, springing from the nature and limits of the judicial power of the United States, is *inflexible and without exception*[.] […] On every writ of error or appeal, *the first and fundamental question is that of jurisdiction*, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it.
>
> Moreover, because **it is not sufficient that jurisdiction may be inferred argumentatively from averments in the pleadings, it follows that the necessary factual predicate may not be gleaned from the briefs and arguments themselves. This first principle of federal jurisdiction applies whether the case is at the trial stage or the appellate stage**.

E.g., Bender, 475 U.S. at 546-547 (cleaned up).

This has always meant an *affirmative* identification of the diverse party and their citizenship, not an assumption that diversity likely exists.

The affirmative-identification requirement goes back centuries. E.g., Bingham, 3 U.S. at 383 (1798) ("necessary to *set forth* the citizenship"); Brown, 33 U.S. at 115 (1834) (MARSHALL, C.J.) ("The decisions of this [C]ourt require, that *the averment of jurisdiction shall be positiv*e […]shall state ***expressly the fact on which jurisdiction depends.***"); Cameron, 127 U.S. at 324 (1888) ("*distinct statement of the citizenship of the parties, and of the particular State in which it is claimed*").

It applies to §1332(d) too: diversity jurisdiction cannot exist without "***identifying*** the [diverse] parties' states of citizenship" – *i.e.*, to remove they must "***identify a specific, diverse class member***[.]" E.g., Dancel v. Groupon, 940 F.3d at 385-386 (7th Cir. 2019); D.B. Zwirn Special Opportunities Fund, L.P. v. Methrota, 661 F.3d 124, 127 (1st Cir. 2011); Toulon v. Cont'l Cas. Co., 877 F.3d at 733 (7th Cir. 2017) (requirement under §1332(d) to "***identify*** the ***name*** and ***state of citizenship*** of at least one plaintiff whose citizenship is diverse[.]").

The Ninth Circuit has said so too. E.g., Sanchez v. Ameriflight, LLC, 724 F. App'x 524, 526 (9th Cir. 2018) ("[Defendant] failed to carry its burden of establishing minimal diversity[.] […] None of the declarations relied on by [defendant] ***identify any specific putative class member that was diverse from***

***[defendant] as of the date the suit was commenced***.”); cf. Ibarra, 775 F.3d at 1197 (9th Cir. 2015) (no “removal jurisdiction by mere ***speculation and conjecture***”).

***Third***, the citizenship that must be established is the domicile of the person at the *time of filing* of the complaint. E.g., Royal Canin, 604 U.S. at 38 n.8 (“*time-of-filing* rule applying to citizenship”); §1332(d)(7).

*****

Under these principles, there plainly wasn’t diversity jurisdiction *established* below.

***First***, the District Court’s position that a showing of *harm* in another state established diversity jurisdiction is error.

The District Court focused upon allegations that there were harms “in Florida and Canada[.]” 1-ER-45; 1-ER-10; 3-ER-529¶47; 3-ER-530¶52.

This is error for numerous reasons:

- *These allegations say nothing about* ***domicile****.* These allegations at best refer to a place of *injury* in 2017, 3-ER-529¶47, or 2019, 3-ER-530¶52. Place of injury doesn’t establish *domicile*. Place of injury doesn’t tell us domicile, let alone where they were domiciled in *2021* at the complaint’s time-of-filing. So, these allegations do not establish diversity. E.g., King, 903 F.3d at 879 (9th Cir. 2018) (“A person’s state of citizenship is established by *domicile*, not simply residence[.]”); Johnson v. Johnson, 615

F. App'x 430, 431 (9th Cir. 2015) ("Johnson's statement that he is 'an American citizen nonresident of any state' does not further his cause or establish diversity."). Diversity here requires showing state of *domicile in 2021*, ***not*** state of *injury* in 2017.

- *These allegations say nothing about **the beneficiary***. The only possibly minimally-diverse person here under the class definition is a legal "beneficiary" of a "decedent." 3-ER-538¶76b ("*ascertainable beneficiaries* [...] of *decedents*"). That's because anyone else, by class definition, must be a California citizen. 3-ER-538¶76a ("ascertainable California citizens"). So, not only do the allegations not establish *who* the legal beneficiary of any dead child is, they don't tell us *where* the legal beneficiary was domiciled in 2021 under the time-of-filing rule.

- *These allegations do not identify a **specific person or that specific person's state of domicile**.* The case law discussed above requires that there be a *specific identified persons* for diversity jurisdiction. Defendant isn't the first party to want to remove to federal court without establishing diversity. Nonetheless, the Supreme Court has been clear that diversity jurisdiction requires that domicile appear must "***affirmatively appear in the record***" – and not merely be "**inferred argumentatively**[.]" E.g., Bender, 475 U.S. at

546. So, there must be a "distinct statement of the citizenship of the parties, ***and of the particular State***" used to establish diversity. Cameron, 127 U.S. at 324; Sanchez, 724 F. App'x at 526 (9th Cir. 2018) ("***identify any specific putative class member***."); Toulon, 877 F.3d at 733 ("""***identify*** the ***name*** and ***state of citizenship***).

So, in short, these allegations don't establish diversity jurisdiction for all of these reasons.

***Second***, the District Court held that there can be a demonstration of diversity simply from the *class definition*.

The District Court held that it had diversity jurisdiction because the second *class definition* was not expressly restricted to California. 1-ER-45 ("no geographical limits"); 1-ER45 ("broad class"); 1-ER-10 (holding that a class not restricted to California is "by definition" including "class members outside of California"). From the mere fact that the class definition wasn't definitively limited geographically, it reasoned that there must be "non-citizens of California" – *without* specifying a diverse person's domicile. 1-ER-47; 1-ER49; see 1-ER-9-10 (reiterating "prior analysis" and "prior order"). This use of the class definition alone is erroneous.

The mere fact that a class definition isn't completely restricted to California citizens does not affirmatively establish diversity:

- *Contrary to the statute*: Contrary to the District Court, §1332(d) directs courts to *use* the class definition to determine the *scope* of possible class members, ***but*** it *still* requires specifically identifying a diverse class-member. Compare §1332(d)(1)(D) (requiring the diverse person be "within the [class] *definition*"), with §1332(d)(2)(A) (further requiring that a "member of a class of plaintiffs is a citizen of a State different from any defendant").

- *Contrary to case law*: This Court and other Circuits *require* identifying the diverse person from among the class, not merely speculating that there are likely to be some. E.g., Faulk, 159 F.4th at 622 (9th Cir. 2025) (diversity "if any class member has a citizenship different from any defendant" – not merely if the class definition isn't restricted to the defendant's state); Sanchez, 724 F. App'x at 526 (9th Cir. 2018) ("***identify any specific putative class member***."); Toulon, 877 F.3d at 733 ("""***identify*** the ***name*** and ***state of citizenship***"); Santos-Pagan, 2024 WL 4350990, at *4 (D.P.R. Sept. 30, 2024) ("I ***decline to find minimal diversity based on class definition alone***[.]").

- *Inversion of the burden*: The District Court's view *flips the burden*, excusing the party invoking jurisdiction from *establishing* jurisdiction by instead *requiring* the other side to affirmatively negate any possibility of jurisdiction. Cf. Lincoln, 546 U.S. at 84 ("not incumbent […] to negate a potential" party).

- *Radical Implications*: This jurisdiction-by-class-definition-alone view is radical. It would mean that, as far as the diversity goes, *anyone* can meet the diversity requirement to file in federal court so long as they simply don't geographically restrict the complaint's class-definition to one state.

***Third***, the District Court thought it could simply hypothesize that, despite a lack of an identified person and established diversity, diversity of citizenship was *probabilistically* likely. That's error.

Under the cases stated above, from the individual case to the class-action, courts require *identifying* a diverse person and diverse domicile, not guessing that there is one. See Sanchez, 724 F. App'x at 526 (9th Cir. 2018) ("***identify any specific putative class member***"); Toulon, 877 F.3d at 733 (same); Dancel, 940 F.3d at 386 (same"). And, moreover, the class definition here requires it to be shown that they're ascertainable. 3-ER-538¶76b.

That's for good reason. There's wisdom in requiring identification of a diverse person.

Demanding that jurisdiction and diversity be established (not just likely) upfront is far more administrable, saves significant time for courts, and avoids advisory decisions where diversity jurisdiction, though seemingly likely, ultimately proves lacking. See, e.g., Sprint, 593 F.3d at 674 (7th Cir. 2010) ("There are any number of ways in which our assumptions about the citizenship of this vast class might differ from reality.").

That's *why* we don't just guess but set rules requiring jurisdiction be established upfront. Cf. Hertz, 559 U.S. at 94 (2010) ("courts benefit from straightforward rules under which they can readily assure themselves of their power to hear a case.").

It may seem easier to guess.

There's an understandable temptation to just guess jurisdiction where diversity seems highly probable. But, that's exactly the problem: there will *always* be a very high probability of diversity for persons of unknown citizenship. Suppose a plaintiff sues a defendant of unknown citizenship. *Based on population statistics, there will always indicate that there is an* ***over 99%*** *chance that the defendant of unknown citizenship is a citizen of another state or country*. See https://www.census.gov/popclock/. And, in class-actions involving over 100

people, the probability of minimal diversity from raw statistics is even higher. See 28 U.S.C. §1332(d)(5)(B).

***Bare probability of diversity proves too much***, because there's always over 99% likely that there are diverse persons in a class of 100 and a world of over 8 billion. The point is simple. Whenever a person's citizenship is unknown, there is always a high likelihood that such a person is a citizen of a diverse state or country. But that doesn't tell us anything about the *actual* citizenship of any *particular* person in the class. That's *why* Courts determine diversity jurisdiction by looking at *actual* not *probable* citizenship.

And, ultimately, the more likely it is that there is in fact a diverse person, the easier it should be for the party invoking federal jurisdiction to simply identify that diverse person and their citizenship.

*****

Along similar lines, the District Court suggested that jurisdiction was somehow conceded.

In arguing for remand under the initial complaint (not the operative complaint), Plaintiffs stated that it is *probabilistically likely*. 3-ER-488 n.4 ("very likely"). And, the District Court seems to think this mere probabilistic likelihood (which is true in *any* diversity action) somehow absolves Defendant of having *establish* diversity. 1-ER-10 ("concede").

That's wrong.

*First*, it misreads what Plaintiffs said. The point made there was that you could guess that diversity is a >99% probability, but that wouldn't be sufficient to *establish* diversity in the absence of factual allegations about a specific person and their specific citizenship. Indeed, the statement was made in a *brief* ***challenging*** diversity jurisdiction. 3-ER-488 n.4.

*Second*, the District Court is incorrect to think that, somehow, its obligation to ensure its subject-matter jurisdiction can be waived/forfeited by a statement in a brief. E.g., Fort Bend Cnty., Texas v. Davis, 587 U.S. 541, 548 (2019) (subject-matter jurisdiction must confirmed, even "*sua sponte*").

*Third*, that statement was made in the context of discussing the initial complaint, not the operative amended complaint.

So, under Royal Canin, that simply wouldn't matter. 604 U.S. at 35 ("***[T]he new pleading 'supersedes' the old one: The 'original pleading no longer performs any function in the case.***'"). And, "challenges to subject-matter jurisdiction may be raised […] at any point in the litigation," Fort Bend, 587 U.S. at 548, so, to be clear, Plaintiffs object to and challenge jurisdiction and did so fully, factually and facially, for the amended complaint.

They do not concede it any respect. And, insofar as the District Court thought the remand obviated the need to *establish* jurisdiction, it erred. Compare id. ("any point in the litigation") with 1-ER-3.

*****

Jurisdiction by probability (rather than jurisdiction-in-fact) presents an administrative nightmare, provides no discernable limiting principles, would dramatically alter federalism's delicate and sacred balance between federal and state courts, and would inundate the federal dockets with easily avoidable post-removal fights about jurisdiction. The alternative is simple: do what the courts have done for centuries and require the removing party to specifically identify the diverse person and their State of citizenship.

iv. Moreover, the statute and the Constitution require the case to be diverse, such that there must be a minimally diverse person in the case.

The final important point is that the District Court's purported exercise of diversity jurisdiction presents a *Constitutional* problem. That's because the *Constitution* requires that the case be "*between citizens of different states*[.]" U.S. Cons., art. III, § 2. And, this is a case between *Californians*.

***First***, this Court and numerous Circuit decisions interpret §1332(d) to require minimal diversity among the ***parties*** to the case. E.g., Chan, 844 F.3d 1133, 1137 (9th Cir. 2017) ("*minimal diversity (i.e., one **plaintiff** is a citizen of a different state than one **defendant***)"); Cooper, 760 F.3d 103, 106 (1st Cir. 2014) (same); Cutrone, 749 F.3d 137, 142 (2d Cir. 2014) (same); Scott, 865 F.3d 189, 194 (4th Cir. 2017) ("*minimally diverse **parties***"); AU Optronics, 699 F.3d 385, 388 (4th Cir. 2012) ("*minimal diversity does not exist among the named **parties***"); Katrina, 524 F.3d 700, 706 (5th Cir. 2008) ("*minimal diversity of **parties***"); SSM Health, 126 F.4th 1329, 1333 (8th Cir. 2025) ("*minimal* (as opposed to complete) *diversity among the **parties***").

***Second***, the Circuits interpret §1332(d) to require diversity among the parties *because the Supreme Court's interpretation of Article III is that minimal diversity must exist among the Parties*. E.g., State Farm, 386 U.S. 523, 531 (1967)

("Article III poses no obstacle to the legislative extension of federal jurisdiction, founded on diversity, *so long as any* ***two adverse parties*** *are not co-citizens*."); id. at 531 n.7 (noting party minimal diversity applies in "class actions"); Saadeh v. Farouki, 107 F.3d 52, 54–55 (D.C. Cir. 1997) ("Article III requires only minimal diversity, that is, diversity of citizenship between any two parties on opposite sides of an action[.]").

***Third***, so, the District Court's interpretation of the diversity statute under §1332(d) interprets the statute in a way that causes a *Constitutional-diversity* problem here. A case by Californians against a Californian is not a case "*between citizens of different states*[.]" U.S. Cons., art. III, § 2. Under the Constitution, there's no diversity.

***Fourth***, it's plain there are only Californians in the case. As has been conceded, every party is a *Californian*. See Section I.A.i, *supra*. Yet, in interpreting §1332(d) in a manner to *create* this Constitutional problem, the District Court doesn't try to resolve it, saying absolutely nothing about the Article III.

***Fifth***, there are plainly no other parties at present. E.g., Murphy Bros. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 350-351 (1999) ("[O]ne becomes a party […] only upon service of a summons[.]"); cf. Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811-812 (1985).

Plainly, there is no diversity *in the case* at present. Accordingly, there is no federal jurisdiction. The District Court's contrary view under its "prior" analysis that ignored the Constitution should be vacated.

### B. The District Court erred in refusing to remand under §1332(d)(4) (or §1332(d)(3)) and, alternatively, erred in refusing to permit jurisdictional discovery by analyzing the wrong complaint.

Section 1332(d)(3)-(4) has exceptions to jurisdiction. They are met on this record and, so, the District Court erred in retaining jurisdiction.

#### i. The District Court erred in refusing to apply the amended complaint which specifically demonstrates all elements required to remand.

There are "exceptions" to §1332(d) jurisdiction under §1332(d)(3)-(4). E.g., Adams v. W. Marine Prods., Inc., 958 F.3d 1216, 1220 (9th Cir. 2020). They're met here, especially the §1332(d)(4)(B) exception.

***First***, Defendant is primary defendant.

"Singh v. American Honda Finance Corp., 925 F.3d 1053, 1068 (9th Cir. 2019), sets out various factors a district court must consider when determining primary-defendant status." Stelman v. Amazon.com, Inc., 2023 WL 7017093, at *1 (9th Cir. 2023). The two key (but non-exhaustive) factors are **(1)** whether the defendant is sued for its own acts and **(2)** the defendant's relative exposure. Singh, 925 F.3d at 1068.

Defendant is plainly the primary defendant.

Here, Defendant is sued for its own actions on its own platform for direct, not vicarious, responsibility. E.g., 3-ER-525¶29-533¶65. It's the *only* defendant. And, given that the case pertains to what Defendant did with *its* algorithm to *its* most vulnerable users, it would face the bulk, if not all, of the liability for this loss of life. There is no other defendant here and no other person who would face liability on this theory.

***Second***, Defendant was sued in its home state.

Section 1332(d)(4)(B) requires that "the primary defendants, are citizens of the State in which the action was originally filed." Defendant is a Californian. This action was originally filed in California state court. This element is met.

***Third***, the complaint alleges that two thirds of the classes are California citizens, 3-ER-538¶77, in light of the fact that all *injured* California citizens are proposed class members, but *only* ascertainable legal beneficiaries of decedents can be out-of-state.

On this record, the §1332(d)(4)(B) exception to jurisdiction is met based on the allegations in the operative complaint. (And, likewise, the §1332(d)(3) discretionary exception is also. 3-ER538¶77).

******

The District Court, however, refused to remand the case on the basis of §1332(d)(3)-(4).

***First***, the District Court initially denied remand under the §1332(d)(3)-(4) exceptions on the basis of the *wrong complaint*. 1-ER-42 (considering only "original Complaint"); 1-ER-48 (analysis of §1332(d)(3)-(4) under original complaint). Yet, under Royal Canin, the correct complaint for purposes of determining §1332(d)(3)-(4) exceptions was the *amended complaint*. 604 U.S. at 30.

***Second***, the District Court again denied remand under §1332(d)(3)-(4) after remand. 1-ER-10-12.

The District Court had initially denied the §1332(d)(3)-(4) exceptions *without* prejudice. 1-ER-47 ("**DENIED WITHOUT PREJUDICE**"). After remand, Plaintiffs renewed their request. 2-ER-118; 2-ER-80. The District Court again denied remand. 1-ER-12.

The District Court held that Plaintiffs needed to present "facts in evidence" – not just allegations. 1-ER-12. It cited no case law for this requirement. Its prior order had cited Mondragon v. Capital One Auto Fin., 736 F.3d 880, 884 (9th Cir. 2013), for this facts requirement. 1-ER-47. Yet, the District Court overlooked some key aspects of Mondragon:

- Mondragon only required *facts* (instead of allegations) "***[w]here facts are in dispute***[.]" 736 F.3d at 883 ("*Where facts are in dispute*, the statute requires district courts to make factual findings […]"); id. ("The statute does not say that remand can be based simply on a plaintiff's allegations, *when they are challenged by the defendant*."). Yet, Defendant's opposition to remand did not challenge the veracity of the amended complaint's allegations. 3-ER-438-439. Likewise, Defendant's post-remand briefing did dispute §1332(d)(3)-(4) remand, but nowhere challenged the veracity of the amended complaints allegations. 2-ER-141-143.

- In Mondragon, the plaintiff request relied "*entirely on his proposed class definitions*," id. at 882, and those class definitions were *not* based upon the class-members' *citizenship*, id. at 883. By contrast, the class definitions here expressly speak to citizenship, 3-ER-538¶76a-b, and there's *an additional* allegation about these class compositions, 3-ER-538¶77, an allegation whose veracity hasn't been challenged.

- To the extent that these allegations are challenged and so facts are required, Mondragon strongly supports permitting jurisdictional discovery. Id. at 885 (remanding to permit "jurisdictional discovery" because of the dispute).

So, Plaintiffs submit that the §1332(d)(3)-(4) exceptions are met, but to the extent that they are not, that strongly supports an opportunity to conduct jurisdictional discovery.

ii. The District Court erred by re-adopting, even after *Royal Canin*, its prior position on jurisdictional discovery that was based upon the wrong complaint.

Below, Plaintiffs sought jurisdictional discovery, 3-ER-502-517, and then renewed this request after remand, 2-ER-118, 2-ER-59-60.

The District Court initially denied jurisdictional discovery on the basis of the *wrong complaint*. 1-ER-42, 1-ER-48-49. After remand, the District Court denied it again *without updating any of its analysis under the correct complaint*. 1-ER-12 n.4. The totality of the District Court's response is: "The Court again **DENIES** plaintiffs' request for jurisdictional discovery for the same reasons previously stated. (Dkt. No. 45 at 12 [1-ER-49].)" 1-ER-12 n.4.

Yet, those "same reasons" were directed at the *incorrect complaint*. Royal Canin, 604 U.S. at 30, 35.

So, reiterating an analysis that didn't take into account the *changed class definitions*. The District Court's refusal to permit jurisdictional discovery should not be sustained. Whether you view an analysis aimed at the *incorrect* complaint with major substantive changes as applying an "erroneous legal standard or clearly erroneous finding of fact," Adams, 958 F.3d at 1220 (9th Cir. 2020), or a failure to "exercise any substantive discretion about the scope of discovery," Stevens, 899 F.3d at 677 (9th Cir. 2018), the result is the same: the one-sentence re-adoption of an analysis aimed at the *incorrect* complaint was error.

iii. Under the correct standards, jurisdictional discovery should've been permitted.

***First***, the *only* materials needed for jurisdictional discovery are the contact information for Defendant's accounts that watched the show. The *only* needed discovery would be the single RFP and/or ROG were proffered into the record. 2-ER-72-73 (single proposed RFP); 2-ER-70-71 (single proposed ROG). This information is exclusively in Defendant's possession. (And, Plaintiffs are fine keeping it AEO).

***Second***, this information would be readily obtained.

Plaintiffs' counsel consulted with a data-retrieval expert, a long-time professional data scientist. 2-ER-64-69. His declaration is worth reading in full, but makes clear that this discovery could be done by an "entry-level" employee doing "**5 to 10 minutes of work**":

> I cannot stress enough that this task is simple and getting the account contact information associated with accounts that watched a particular show could be **readily accomplished by an entry-level data scientist who knew where the data is stored in about 5 to 10 minutes of work**, with the rest being time it takes for computer in finish running the query[.] […] **I have no doubt that Netflix could easily accomplish this.** […] This is a ***truly elementary request.***

2-ER-66.

***Third***, jurisdictional discovery "*should ordinarily be granted* where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." E.g., Yamashita v. LG Chem, Ltd., 62 F.4th 496, 507 (9th Cir. 2023); Am. W. Airlines, Inc. v. GPA Grp., Ltd., 877 F.2d 793, 801 (9th Cir. 1989) ("[W]here pertinent facts bearing on the question of jurisdiction are in dispute, *discovery should be allowed*[.]"). So, insofar as Defendant disputes that the §1332(d)(3)-(4) exceptions are met, Plaintiffs should have had *some* opportunity to be able to get access to information that's *exclusively* in Defendant's possession.

***Fourth***, Congress "contemplated" that "limited [jurisdictional] discovery" would be allowed. Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc., 485 F.3d 793, 803 (5th Cir. 2007); Coleman v. Estes Exp. Lines, Inc., 631 F.3d 1010, 1017 (9th Cir. 2011) ("limited discovery may be necessary"). Accordingly, it's frequently *granted* for §1332(d)(3)-(4) exceptions. E.g., Speed v. JMA Energy Co., LLC, 872 F.3d 1122, 1125 (10th Cir. 2017); McGuire v. PacifiCorp, 790 F. Supp. 3d 1059, 1066 (D. Or. 2025); Spargifiore, 2021 WL 533727, at *1 (C.D. Cal. Feb. 12, 2021); Brinkley v. Monterey Fin. Servs., Inc., 2016 WL 4886934, at *6 (S.D. Cal. Sept. 15, 2016).

***Fifth***, courts have permitted exactly this type of request to get class-contact information exclusively in Defendant's possession. E.g., Adams, 958 F.3d at 1219 (9th Cir. 2020) (noting "jurisdictional discovery to establish the applicability of the [§1332(d)(4)] exception" included "*a list of contact information (including name, phone number, last known personal address, hire date, and, where relevant, termination date) in its possession*"). Reddick v. Glob. Contact Sols., LLC, 2015 WL 4488328, at *1 (D. Or. July 21, 2015) (similar).

***Sixth***, discovery is especially warranted insofar as the removing defendant put class composition in dispute. Mondragon, 736 F.3d at 885. Insofar as Defendant didn't dispute the class composition, the exception applies. See Section I.B.i, *supra*. Insofar as Defendant did dispute it, then it's profoundly unfair to render what Congress designated as a *mandatory* jurisdictional exception impossible to prove, since the other elements of §1332(d)(4)(B) are plainly met here.

Given that the District Court *refused* to permit *any* possibility to determine the class composition via limited discovery *and* then *relied solely* upon that refusal to deny §1332(d)(4) remand, this Court is "presented with a situation ***wherein the district court stymied [Plaintiffs'] efforts to marshal evidence and conduct discovery.***" Preston v. Tenet Healthsystem Mem'l Med. Ctr., Inc., 485 F.3d 804, 821 (5th Cir. 2007).

This Court should reverse.

### C. The District Court failed to consider in any respect its Article III jurisdiction.

i. Article III jurisdiction was entirely disregarded below, despite repeated requests.

Both before and after remand, Plaintiffs made repeated requests and challenges to the District Court's Article III jurisdiction. 2-ER-51-52, 2-ER-85-86; Dkt.70:7-8. The District Court entirely ignored these requests and has never considered or assessed whether it had Article III injury-in-fact jurisdiction. 1-ER-38-49 (nowhere discussed); 1-ER-12 (nowhere discussed); 1-ER-3 (nowhere discussed).

That's deeply erroneous. The District Court had a fundamental "obligation to assure [itself] of litigants' standing under Article III ***before*** proceeding to the merits." Dep't of Educ. v. Brown, 600 U.S. 551, 560-561 (2023); O'Shea v. Littleton, 414 U.S. 488, 493 (1974) ("threshold requirement"); FDA v. All. for Hippocratic Med., 602 U.S. 367, 378 (2024) ( "bedrock constitutional requirement"); Eng v. EPA, 172 F.4th 747, 750 n.1 (9th Cir. 2026) ("obligation to address").

This Court need not address this issue *ab initio*. This Court is a court of "***review, not first view***." E.g., Defries v. Union Pac. R.R. Co., 104 F.4th 1091, 1109 (9th Cir. 2024).

It can simply vacate and remand.

ii. Article III injury-in-fact isn't met for the Plaintiffs on this record.

Three principles readily refute that there is Article III injury-in-fact demonstrated so far in this case.

***First***, Article III injury-in-fact requires the party invoking federal jurisdiction to show that the plaintiffs have a "***personal stake***" and are "***not mere bystanders***" to another's injury. Diamond Alternative Energy, LLC v. EPA, 606 U.S. 100, 110-111 (2025); Hippocratic, 602 U.S. at 379-380 (same); TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021) (same); Spokeo, Inc. v. Robins, 578 U.S. 330, 339 (2016) (requiring plaintiffs "***personally has suffered some actual […] injury***").

Yet, here, Defendant has not made that showing. Yes, Plaintiffs' daughter and sister died. Yet, *they* did not suffer personal injury; Bella Herndon did. Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 77 (1991) (The "standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the *particular claims asserted*.").

Bella has died – and her brothers and father are "one-step-removed" from her death. E.g., Murthy v. Missouri, 603 U.S. 43, 57 (2024) ("cannot redress "injury that results from the independent action of some third party not before the court").

***Second***, the District Court ignored another missing requirement Article III injury-in-fact.

There must be a "close historical or ***common-law analogue for their asserted injury***." TransUnion, 594 U.S. at 424-425; id. at 453-454 (THOMAS, J., dissenting) (noting the majority has "***constitutionally precluded***" Article III jurisdiction unless a right has "***common-law roots***.").

The common-law is clear: there was no cognizable injury for "*death of a person*." E.g., Clark v. Goodwin, 170 Cal. 527, 529 (1915) ("It is only by virtue of some such statute as this that an action for the death of a person can be maintained in this state, ***no such right of action existing under the common law***."). "***Nothing was more firmly settled at common law***[.]" Id. That death was *not* a cognizable injury was so well-settled there was a Latin phrase for it: 'actio personalis moritur cum persona". E.g., Henshaw v. Miller, 58 U.S. 212, 219 (1855) ("The maxim of the common law is '***actio personalis moritur cum persona***[.]'"); Hunt v. Authier, 28 Cal.2d 288, 290 (1946) (same).

Translated, this Latin phrase means that "***a personal action dies with the person***." Sullivan v. Delta Air Lines, Inc., 15 Cal.4th 288, 293 (1997). The common-law didn't recognize death as a form of injury – so Article III injury-in-fact cannot be predicated upon the fact that Bella Herndon *died*.

And, as discussed above, Plaintiffs did not suffer physical injury. It was *Bella Herndon* who died, which, because it was *not* recognized at common law as a cognizable injury, cannot serve as a basis for Article III injury-in-fact.

***Third***, the fact that California has bestowed *statutory* standing upon Bella's relatives doesn't change this fact. Where Article III injury-in-fact is lacking, *statutory* standing cannot create it. Cunningham v. Cornell Univ., 604 U.S. 693, 708-709 (2025) ("Article III standing requires a concrete injury even in the context of a statutory violation[.]"); TransUnion, 594 U.S. at 426 (Legislatures "may not simply enact an injury into existence[.]"); Spokeo, 578 U.S. at 338 (Article III-injury requirement is a "***constitutional requirement***" – that's not met by pointing to a statute).

*****

Defendant as the party invoking Article III power bore the burden on Article III jurisdiction here. E.g., California v. Texas, 593 U.S. 659, 670-671 (2021) ("must be able to show"). It's made no showing.

iii. On this record, Article III injury-in-fact isn't met for any diverse class-member whose injury-in-fact would be necessary to sustain diversity jurisdiction.

It's not just the named Plaintiffs: "Every class member must have Article III standing in order to recover individual damages." TransUnion, 594 U.S. at 431; Farella v. Benton Cnty. Dist. Ct., 176 F.4th 562, 566 (8th Cir. 2026) ("Class actions are subject to these same requirements."). Although the Supreme Court didn't decide precisely at what point of litigation Article III jurisdiction must be shown for *all class members*, TransUnion, 594 U.S. at 431 n.4, that's because it didn't have to in TransUnion where there was plainly Article III injury-in-fact and subject-matter jurisdiction sufficient to sustain the civil action in some respect. That's not true here.

*If* Defendant doesn't make out Article III injury-in-fact as to *some* minimally diverse person, then Article III's injury-in-fact requirement not being met as to that person entails that there is no diversity here. So, in this *diversity* context, it's required.

******

Here, there's no dispute that all named and identified parties are California citizens. 1-ER-45 ("There is no dispute here that Netflix and the named plaintiffs are not diverse.").

Defendant removed on the basis of *diversity*. Yet to date, despite the grieving family asking for years, no citizen has ever been identified by name or state of citizenship who is not from California. That silence speaks volumes. Out of respect for the dead, and respect for the grieving family, *someone* should identify the diversity.

This Honorable Court should reverse on jurisdictional discovery, vacate as to the remainder, and remand.

## II. The District Court Erred on Survival Limitations and Wrongful-Death Standing.

The issues above, see Section I, *supra*, must be decided first because they are jurisdictional. If survival limitations and wrongful-death standing are reached, this Court should reverse.

### A. RULE OF DECISION ACT: California state case law governs for all merits issues in this case.

If there is jurisdiction, *state* law governs the merits. E.g., 28 U.S.C. § 1652; Berk, 607 U.S. at 192 (2026) ("The Rules of Decision Act directs federal courts to apply state substantive law[.]"); id. at 199 (state substantive law determines "rights," "remedies" and "rules of decision"); Ferguson v. Horizon Lines, LLC, 602 F. App'x 664, 666 (9th Cir. 2015) (for "diversity jurisdiction," "California law governs").

State law is applied in the "same manner as a federal court resolves an evolving issue of federal law." E.g., Salve Regina Coll. v. Russell, 499 U.S. 225, 226-227 (1991); AGK Sierra De Montserrat, L.P. v. Comerica Bank, 109 F.4th 1132, 1142-1143 (9th Cir. 2024) (Miller, J., concurring) (must "apply" state supreme-court decisions).

### B. SURVIVAL LIMITATIONS: The District Court erred in holding that Bella's death shortened the time to assert her survival claims.

i. Bella Herndon's survival claims are timely under §366.1.

When Bella Herndon died at fifteen, her personal-injury claims "survive[d]" her death. See CCPC§377.20(a). And, California's statute on survival limitations instructs that Bella's claims may be brought until the end of the "limitations period that would have been applicable if [Bella] *had* ***not*** *died*." See CCPC§366.1(b). This makes sense.

It makes sense to apply the limitations period as though Bella had *not* died because these survival claims are the same "right of action which [Bella] would have had *if [s]he had survived the injury*." E.g., Munro v. Pacific Coast Dredging & Reclamation Co., 84 Cal.515, 524 (1890); Grant v. McAuliffe, 41 Cal.2d 859, 864 (1953) (Survival of claims "do[es] not create a new cause of action[.]").

If Bella had *not* died, the limitations period that would have been applicable would have expired on her twentieth birthday, *i.e.*, on May 1, 2021. 2-ER-244 (Bella's date of birth was May 1, 2001); CCPC§352(a) (limitations period doesn't begin until "age of majority"); CCPC§335.1 ("two years" limitation period for personal injury).

Bella's survivor claims are timely. The District Court's contrary conclusion should be reversed.

ii. The District Court found otherwise by overlooking §366.1.

In dismissing the claims, the District Court overlooked the operative California statute on survival limitations. 1-ER-17 (never citing CCPC§366.1). That's a big oversight.

After all, the statute directs to consider the limitations period that "***would have been** applicable if [Bella] had **not** died*. CCPC§366.1(b). And, the California Supreme Court has repeatedly clarifies that the survival-limitations statutes, as originally enacted and later re-codified, may "*prolong the time originally limited, [but] **cannot operate in any case to shorten it***." E.g., Lowell v. Kier, 50 Cal. 646, 648 (1875). Yet, that's *exactly* what the District Court's order did: erroneously shorten the time to sue. Its ruling *shortened* the time to sue by over two years—from May 1, 2021, to April 28, 2019—effectually holding that minor tolling cannot apply to a decedent child. See 1-ER-17. That's reversible error.

The District Court cited CCPC§377.30, but CCPC§377.30 says nothing about limitations. Rather, CCPC§377.30 concerns "who *succeeds* to such a cause of action and who may *prosecute* such a cause of action"—not about the time in which that action may be brought. Lickter v. Lickter, 189 Cal.App. 4th 712, 721 (2010). CCPC§377.30 is about "*standing* to sue"—not the time to sue. Maleti v. Wickers, 82 Cal.App. 5th 181, 227 (2022).

The District Court's order erred by ignoring the operative statute on survival limitations (§366.1) and by applying a statute that's inapposite to the issue (§377.30). See 1-ER-17.

iii. California has not imposed any restriction on tolling under §366.1

Where a California statute operates as a restriction on tolling, it says so expressly. Yet, no such express statutory tolling applies here. Section 366.1 has none.

Notably, the broader *survival statute* does have some restrictions on tolling, but none apply *here*. Compare CCPC§366.**2**(b) (barring all tolling with enumerated exceptions) with CCPC§366.**1** (no tolling restrictions). The *minor-tolling statute* also has restrictions on tolling, but none apply *here*. CCPC§352(b). And, some causes of action, like medical malpractice, have restrictions on tolling. CCPC§340.5 (medical-malpractice restrictions on tolling). Personal-injury claims don't have restrictions on tolling. CCPC§335.1.

Where the California Legislature wants to restrict tolling, it says so. There aren't any restrictions on tolling that would apply here:

- Not in the survival limitations statute. CCPC§366.1.
- Not in the minor-tolling statute. CCPC§352.
- Not in the personal-injury limitations statute. CCPC§335.1.

The *absence* of *any* applicable restrictions on tolling in the operative statutes speaks volumes: by restricting tolling *elsewhere* but *not* for §366.1, tolling applies to §366.1.

The California Supreme Court makes clear that the survival-limitations statute are meant "***not to curtail, but to prolong the period***" for bringing an action. E.g., Smith v. Hall & Huggins, 19 Cal. 85, 86 (1861); Lowell v. Kier, 50 Cal. 646, 648 (1875) (Death "***cannot operate in any case to shorten***" time to sue.); Berger v. O'Hearn, 41 Cal.2d 729, 732 (1953) (survival limitations statute "*cannot be used to curtail*" the time to sue had the person lived); Estate of Bullard, 116 Cal. 355, 357 (1897) (same).

iv. The California law confirms that tolling in CCPC Chapter 4 applies to limitations periods in Chapter 3.

The previous Panel Opinion thought CCPC§366.1's phrase "limitation period" meant limitation period *without* tolling. 2-ER-150-152. That's incorrect:

- **Text**: This is a personal-injury action and the minor-tolling statute "*specifically says*" it applies to personal-injury actions. Compare 2-ER-152 with CCPC§352(a) (***Chapter 4***'s minor-tolling **applies to** actions "mentioned in ***Chapter 3*** (*commencing with Section* **335**)[.]"); CCPC§**335**.1 (personal-injury limitations **in Chapter 3**).

- **Caselaw**: CCPC§366.1 is in chapter 3 and case law is clear that minor-tolling applies to all the limitations period in chapter 3, except where expressly excluded. E.g., Bledstein v. Superior Court, 162 Cal.App. 3d 152, 157 n.2 (1984) ("***The statutes contained in chapter 4 are extremely general and it is clear they are intended to govern the application of all of the specific limitations periods contained in chapter 3***."); Nguyen v. Western Digital Corp., 229 Cal.App. 4th 1522, 1541 (2014).

- **Panel's Case**: The prior Panel cited Shalabi v. Fontana, but Shalabi supports Plaintiffs by "***calculating*** the ***applicable*** [Chapter 3] limitations period" only "***after*** [Chapter 4] age-based tolling ends[.]" 11 Cal.5th 842, 853, 855 (2021);

Here, "***[t]he*** limitations period that would have been applicable if [Bella] had not died" (CCPC§366.1) is the two-year limitations period that would've begun on Bella's 18th birthday and ended on her 20th birthday. That's the governing limitations period.

- **Policy**: The Panel expressed understandable policy concerns about possible tolling lengths. Yet, where the California Legislature wants to exclude or limit tolling it says so expressly. California courts reject the idea that a long tolling period is problematic when that long period is the logical outcome of a tolling statute. E.g., Harris v. Industrial Acci. Com., 204 Cal. 432, 438 (1928) ("***as much as twenty years***"); Tzolov v. Int'l Jet Leasing, 232 Cal.App. 3d 117, 120 (1991) ("***ad infinitum***).

### C. WRONGFUL-DEATH STANDING: The District Court erred in holding that rules of intestate succession bar wrongful-death claims by Bella's brothers.

Bella's brothers sued Defendant for wrongful-death. 3-ER-540¶84-541¶86. The operative statute is CCCP§377.60. Under CCPC§377.60, as interpreted by the California Supreme Court, her brothers have standing. The District Court held her brother didn't have statutory standing. 1-ER-16-17. This Court should reverse that determination.

i. <u>The California Supreme Court has confirmed that the common-law canons of descent govern for statutory standing to assert a wrongful-death action.</u>

CCCP§377.60 governs wrongful-death standing. It provides that for a person like Bella with no issue (*i.e.*, no children, grandchildren, *etc.*), the persons with standing are those "who would be entitled to the property of the decedent by intestate succession." CCPC§377.60(a); CCPC§377.60(e) (noting amendments to the statute were "not intended to adversely affect the standing of any party having standing under prior law").

***<u>Three principles</u>*** announced by the California Supreme Court are essential here.

***<u>First</u>***, the California Supreme Court has clarified that the ***<u>common-law</u>*** rules of succession applied.

The seminal California Supreme Court decision Redfield v. Oakland C.S.R. Co., 110 Cal. 277 (1895), held that wrongful-death standing is determined by "***common-law***" principles of succession:

> [N]or does the word "heirs," as there used [in the wrongful-death statute], refer to those persons who would succeed to the money so recoverable […]; but ***the word [heirs] is used in its common-law sense, and denotes those who are capable of inheriting from the deceased person generally***, and without the limitation resulting from statutes relating to the distribution of community property.

Id. at 290; Gilead Tenofovir, 20 Cal.5th 390, 2026 WL 2223748, *24 (Aug. 3, 2026) ("*The common law of England is declared to be the rule of decision in all the courts of this state* so far as not […] inconsistent with our constitution and statutes.").

***Second***, the common law draws the key distinction between what are called *lineal* and *collateral* heirs.

A "***lineal***" heir is a direct descendant, *i.e.*, someone in a "direct" line of descent like a "grandfather, father, son, and grandson," *etc.* E.g., Thomas Byrne, "Outline of the Law of Descent," 11 Marquette L. Rev. 79, 79¶1 (1926).

By contrast, a "***collateral***" heir is the parents and direct descendants of the parents, *i.e.*, siblings, nieces and nephews, grand-nieces and grand-nephews, *etc.* E.g., id. at 79¶2; Lytle v. Hulen, 128 Ore. 483, 503-504 (1929) ( "BLACKSTONE'S" distinction between "lineal" and "collateral" heirs); Bundy v. Bundy, 38 N.Y. 410,

421 (1868) ("collateral as well as lineal"); McCarthy v. Marsh, 5 N.Y. 263, 277-278 (1851) (distinguishing "lineal heirs" and "collateral heirs").

These two types of heirs – *lineal and collateral* – are are referred to as the "***two common law canons of descent***." E.g., Ryan v. Scully, 21 Cal.2d 498, 500-501 (1943). And, as the California Supreme Court makes clear, "[i]t was the rule at common law that on failure of lineal descendants the inheritance descended to the decedent's collateral relations." Id. at 500.

In modern English, if a decedent had *lineal heirs* (children, grandchildren, *etc.*), then those direct descendants were the heirs. ***But*** if the decedent had no children, *i.e.* "on failure of lineal descendants," the common-law heirs were the *collateral heirs* (*i.e.*, parents, siblings, *etc.*). Id.

***Third***, and most importantly, the California Supreme Court makes clear that heirs aren't just one person but a "***whole succession***" – *i.e.*, the whole line from parents, siblings, nieces and nephews.

At common law, the word "*heirs*" doesn't just mean the immediate successor, but all of the collateral heirs in the line. E.g., Montgomery v. Sturdivant, 41 Cal. 290, 297 (1871) ("[T]he word heirs, would not indicate a specific designation of certain individuals, but […] would clearly be a *nomen collectivum* [collective name], indicating *a class of heirs who would take in perpetual succession.*"); Norris v. Hensley, 27 Cal. 439, 447-448 (1865). ("the

words 'their heirs' [… is] **the whole succession of heirs, lineal and collateral**[.]"). It's not just the immediate heir but the "***whole succession of heirs***" who are designated at common law.

*That's* what the California Supreme Court in Redfield means when it holds that the wrongful-death statutes permit standing according to the ***"common-law sense, and denotes those who are capable of inheriting from the deceased person generally***[.]" 110 Cal. at 290. It means that it's not just the person in direct succession, but rather the "***whole succession of heirs***." Norris, 27 Cal. at 447-448; see Cal. Prob. Code § 50 (defining "Issue" as "***lineal descendants of all generations***"); Burk v. Arcata & M. R. R. Co., 125 Cal. 364, 365 (1899) (permitting "a sister and two brothers" of decedent to sue for wrongful death as "[c]ollateral heirs").

Accordingly, the "whole succession" – *not* just the immediate successor – had standing to sue for wrongful-death.[8]

[8] To address policy/administrability concerns about heirs filing too many lawsuits, the California Supreme Court adopted the "one action" rule as a limiting principle. E.g., Hartigan v. Southern Pacific Co., 86 Cal. 142, 143-144 (1890) ("But ***one action is permitted*** […] [W]hen one action is brought[…] that is the only action which the statute permits[.]"); Munro, 84 Cal. at 522 ("one action is permitted").

Notably, CCPC377.60(a)'s first clause gives wrongful-death standing to lineal descendants if any ("The decedent's surviving spouse, domestic partner, children, and issue of deceased children").

By contrast, *if* no lineal heirs (*i.e.*, "if there is no surviving issue"), then the collateral heirs can sue (*i.e.*, "the persons […] who would be entitled to the property of the decedent by intestate succession."). Id. As the California Supreme Court makes clear this is the "***whole succession of heirs***" under the common-law rule, as stated in Redfield, not just the immediate successor as the District Court erroneously concluded.

*****

Applying these principles, Bella's brothers had statutory standing to sue for wrongful-death.

Bella Herndon died when 15-years-old and had no children. In the terms of the common law, she had no lineal heirs. That means, the persons who could sue were her collateral heirs. Ryan, 21 Cal.2d at 500-501 (1943). ("On failure of lineal descendants the inheritance descended to the decedent's ***collateral relations***."). Her collateral relations were her parents ***and*** her siblings. Critically, under common-law principles, the person with standing isn't just the first person in line (her parents), but the "***whole succession***" of collateral heirs (***including her brothers***).

Her brothers have statutory standing. See, e.g., George Genzel, Brothers and Sisters of Deceased as Beneficiaries within State Wrongful Death Statute, 31 A.L.R. 379§1a (common-law heirs "*confers beneficiary status upon **all persons generally included in the term[s] (which, in a general sense, admittedly, extends to brothers and sisters***"); CCPC§377.60(a)-(e).

ii. The District Court decided otherwise by overlooking the California Supreme Court's authorities and citing cases that did not decide the issue.

The District Court's cited authorities do not indicate otherwise.

***First***, the District Court's analysis contravened the Rules of Decisions Act because it did not cite and apply the cases of the *California Supreme Court*. AGK, 109 F.4th at 1142-1143 (9th Cir. 2024) (MILLER, J., concurring) ("[W]e **must follow** the decisions of the **highest court of the State**."); Vestar Dev. II, LLC v. Gen. Dynamics Corp., 249 F.3d 958, 960 (9th Cir. 2001) ("***bound by decisions of the state's highest court.***").

***Second***, the District Court cited cases from the California Court of Appeals. 1-ER-16.

Yet, these cases support Plaintiffs here. In A.S. v. Miller, 34 Cal.App. 5th 284 (2019), the California Court of Appeals permitted "the ***decedent's parents and siblings***" to have "standing to sue for his wrongful death." Id. at 290.

***Exactly.***

Parents and siblings can sue together because they are *collateral heirs*, as discussed above. If a decedent had children, then only those lineal heirs could sue. Id. ("Thus, a decedent's **parents and siblings** do not have standing to sue for wrongful death *unless* the decedent leaves behind no 'children.'"). Without children, all collateral heirs can sue.

If children, "**parents and siblings**" cannot sue. Id.

If no children, "**parents and siblings**" can sue. Id.

Likewise, Scott v. Thompson, 184 Cal.App. 4th 1506 (2010), is inapposite. It's not a case about about *whether* a decedent's siblings and parents can both sue. Rather, it's about *who* the decedent's true relations were, *i.e.*, whether the father can still be a father even when it's proven that he's not the "biological father." Id. at 1509-1512. Scott addressed a different issue. And, *because* the half-sister didn't *raise* the issue whether a father and sister could both have wrongful-death standing, Scott is not authority on this question, *i.e.*, is "***not authority**, of course, **for issues not raised***[.]" E.g., San Diego Gas & Electric Co., 13 Cal.4th 893, 943 (1996).

## III. THE DISTRICT COURT ERRED ON DUTY OF CARE AND PRODUCTS LIABILITY.

### A. Given that amendment was preserved, the Court could simply remand rather than address additional issues.

Plaintiffs made clear below that, if they prevailed on appeal for survival-limitations or wrongful-death standing, they'd prefer to amend. 2-ER-164-168. The District Court graciously acknowledged Plaintiffs' reservation of the right to amend. 1-ER-13 ("Given the Court's order, plaintiffs agree at this time that amendment would be futile and reserve the possibility of amendment after exhausting their appeal.").

Accordingly, if this Court reverses on either survival limitations or wrongful-death standing, Plaintiffs respectfully request that this Court remand, permitting Plaintiffs to exercise their right to amend. See, e.g., J.B. Painting & Waterproofing, Inc. v. RGB Holdings, LLC, 650 F. App'x 450, 455 (9th Cir. 2016) (permitting remand for amendment after reversing district court on limitations grounds).

If this Court reverses on either of those issues and permits amendment, it would then be unnecessary to consider duty-of-care or strict-products-liability. See Sections III.B-III.C, *infra*.

Plaintiffs can add numerous allegations demonstrating, *inter alia*, (1) how the claims at issue do not rely upon the show's content; (2) how the software product at issue meets the California Supreme Court's governing Escola-Greenman standard for determining what's a product; (3) additional details about the foreseeability of harm; and (4) additional details about how the special-relationship duty is met insofar as Defendant's had constructed an ability to not only manipulate but affirmatively control and direct the behaviors of children while using its platform.

Amendment would not be futile. Amendment was reserved. And, *if* this Court reverses on *either* survivor limitations *or* wrongful-death tolling, the case should be remanded.

**B. The District Court erred on California duty-of-care by excusing a foreseeable, and foreseen, risk of death.**

iii. Special-relationship duty

California recognizes special-relationship duties. Regents of University of California v. Superior Court, 4 Cal.5th 607, 620-621 (2018) (holding "universities have a special relationship with their students" because of (1) level of supervision; (2) "vulnerability" of students; and (3) ability to control environment)

Regents supports a special-relationship duty here. Here, a child was subjected to extraordinary surveillance, manipulation, and control. 3-ER-536¶57-540¶70. So much so that Defendant had actual control over her behaviors on its platform. 3-ER-536¶57, 3-ER-538¶63.

These allegations are impose a special-relationship. All the elements are met: (1) high degree of supervision, e.g., 3-ER-536¶57; (2) vulnerable children, e.g., 3-ER-526¶29; (3) control of on-platform activities, e.g., 3-ER-538¶63; 3-ER-536¶57 ("*control* what you watch"). Pursuant to Regents and other California Supreme Court authority, Netflix has a special-relationship duty to minor users for on-platform activities.

iv. Ordinary duty

Defendant plainly owed an ordinary duty to avoid taking actions that cause children injury and death.

Yet, Defendant took the extreme position that it didn't owe *any* duty of care to avoid injuring and killing children. Defendant argued that "[u]nder California law, duty can be established through [...] the multi-factor duty analysis set forth in Rowland[.]" 3-ER-469. Adopting Defendant's extreme position, the District Court said Plaintiffs failed "to identify a duty to support the negligence-based claims." 1-ER-17.

That's wholly erroneous: "***all persons have a duty to take reasonable care in their activities to avoid causing injury***[.]" E.g., Brown v. USA Taekwondo, 11 Cal.5th 204, 209 (2021).

That warrants reversal.

Moreover, the District Court flipped the burden: the Rowland factors are used to establish an "***exception***" to duty of care. Rowland, 69 Cal.2d at 113; Kesner, 1 Cal.5th 1132, 1143 (2016) ("[W] e rely on these [Rowland] factors **not** to determine whether a *new duty* should be created, but whether an *exception* [...] should be created."). Thus, there *is* a duty and, in truth, Defendant's asking for a special exemption from the near-ubiquitous duty of care to avoid causing physical harm.

Defendant doesn't remotely meet the Rowland factors. It caused a spike in child injuries and suicides. 3-ER-534¶44-535¶53. The harm was foreseen. 3-ER-530¶27-531¶32.

v. No *Rowland* exception

The Rowland factors have "two categories": (1) foreseeability, and (2) policy. Regents, 4 Cal.5th at 649.

**(1) Foreseeability**

"The most important factor to consider [...] is whether the injury in question was foreseeable." Id.

Here, the harms were foreseeable; they were ***foreseen***. 3-ER-530¶27-534¶42. Defendant algorithmically targeted Bella, constantly surveilling and documenting her. 3-ER-536¶567-540¶70. This constant surveillance and Big Data analytics, lead to a personalized knowledge that dramatically increased foreseeability. 3-ER-536¶57-540¶70. Defendant cannot remotely meet its burden on the *foreseeability* prong of Rowland.

**(2) Policy**

Rowland also considers policy. Regents, 4 Cal.5th at 629.

There's no clear policy reason to categorically exclude corporations wielding powerful algorithms over children from the ordinary duty of care. To the contrary, California's public policy clearly tilts the other way. See, e.g., California Age-Appropriate Design Code Act; Escola v. Coca Cola Bottling Co., 24 Cal.2d 453, 462 (TRAYNOR, J., concurring).

In Regents, the Rowland factors did "**not** justify categorically barring an injured student's claims against the university." Regents, 4 Cal.5th at 629. That's because protecting children, incentivizing safer environments, and compensating those tragically injured was better policy. Id. That logic governs here. Online platforms should be encouraged to protect children, create safer online environments, and compensate those grievously injured. 3-ER-542¶¶90-93. Policy rationales plainly do not support giving a license to harm, even kill, children, where it could be easily avoided.

vi. Statutory duty

A duty based upon negligence per se applies where the injured person was "one of the class of persons for whose protection the statute" was adopted. Ramirez v. Nelson, 44 Cal.4th 908, 918 (2008); Elsner v. Uveges, 34 Cal.4th 915, 927 (2004).

The California Age-Appropriate Design Code Act is a statute designed to protect children online. §1(a)(3). It recognizes that "the impact of the design of online products and services on children's well-being has become a focus of significant concern." §1(a)(2). And, it specifically asks "[w]hether algorithms used by the online product, service, or feature could harm children." §1798.99.31(a)(v).

Moreover, the Act imposed a list of duties for companies' online products and platforms:

- "**Shall not** [...] profile a child by default[.]" 1798.99.31(b)(2). That includes, "analyzing or predicting aspects concerning a natural person's [...] personal preferences, interests, reliability, behavior, location, or movements." §1798.99.30(b)(6).
- **should** prioritize the privacy, safety, and well-being of children[.]" §1798.99.29(b).

Thus, there is also a statutory negligence-per-se duty. This Court should reverse the contrary conclusion.

### C. The District Court erred on products liability because software can be a product under California law.

To determine if something is a product under strict-products-liability, courts look to "the principles underlying [California's] doctrine of strict products liability to determine whether it applies." Bolger v. Amazon.com, LLC, 53 Cal.App. 5th 431, 438 (2021).

That didn't happen below. 1-ER-17. Instead, the District Court side-stepped the issue whether mass-market software are products: "There is no strict liability for books, movies, or other forms of media." 1-ER-17 (citing Winter v. G.P. Putnam's Sons, 938 F.2d 1033, 1034-36 (9th Cir. 1989)). That was error because (1) the scope of *California's* products liability law is determined by the Greeman-Escola test and (2) the District Court's cited authority, Winter *supports* Plaintiffs' products-liability claims.

Under Greeman-Escola, software products *are* products.

*****

"California's product liability jurisprudence, traces back to Justice Roger Traynor's famed concurrence in Escola[.]" Jimenez v. Superior Court, 29 Cal.4th 473, 477-478 (2002) (citing Escola, 24 Cal.2d 453 (1944) (TRAYNOR, C.J., concurring)).

In Greenman, the California Supreme Court "embraced Justice Traynor's view, and California became the first state to allow recovery for strict products liability." Id. at 477-478 (discussing Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57 (1963)).

The Greeman-Escola test eschews "wooden formalisms[.]" Daly v. General Motors Corp., 20 Cal.3d 725, 735 (1978); Pierce v. Pac. Gas & Elec. Co., 166 Cal.App. 3d 68, 81-82; n.6 (rejecting arguments that electricity's not "tangible", not "a product" and not "an article"); Loomis 63 Cal.App.5th at 479 (rejecting argument that online platform was "service" rather than product because of Greeman-Escola test). The California Supreme Court applies the "Greenman formulation to the full range of products liability situations[.]" Cronin v. J.B.E. Olson Corp., 8 Cal.3d 121, 134 (1972). And, the Greeman-Escola test doesn't turn on whether you'd colloquially call it a product:

> **[L]liability should not depend simply upon whether electricity is or is not labeled a 'product.' More significantly, we believe the policy justifications for strict liability in tort support its imposition in this case.**

Pierce v. Pac. Gas & Elec. Co., 166 Cal.App. 3d 68, 83; see Hardin v. PDX, Inc., 227 Cal.App. 4th 159, 179 (4th Dist. 2014) ("**Hardin's theory is that PDX's software program, *not the information it produces*, is the defective product.** PDX has not argued, let alone shown, that Hardin cannot prevail **under *that* theory**.").

Applying these principles, the District Cout made numerous errors:

***First***, the District Court analyzed the wrong thing. Plaintiffs asserted that the *algorithms* and *platform* constitute software products. 3-ER-544¶78-545¶83. The District Court didn't address that question. 1-ER-17 (nowhere addressing *that* theory; instead discussing whether a TV show is a product).

***Second***, under the Greeman-Escola test mass-market software products are plainly products.

Under the Greeman-Escola test, a defendant faces strict-product-liability when:

- The defendant place an article "***on the market***."
- Knowing it will be used by consumers "***without inspection***"
- Has a "***defect***" – whether of design or manufacture - that "***causes injury to a human being***"
- And, the producer is "in a ***better economic condition to bear the resulting loss***."

E.g., Jimenez, 29 Cal.4th at 478 (2002); AAS, 24 Cal.4th 627, 638-639 (2000); Carlin, 13 Cal.4th 1104, 1110 (1996). Here, Defendant targeted children with unprecedentedly powerful software products. 3-ER-536¶57-538¶65.

It cannot be seriously disputed that Netflix's software products are (1) mass-market, (2) used without safety inspections by consumers, (3) had a defect that caused injury, or (4) that Netflix is in a better economic condition to bear the loss than the Herndon family.

To state the Greeman-Escola test here is to answer it. Thus, the District Court erred. It nowhere engaged California's governing Greenman-Escola test. 1-ER-17.

***Third***, the District Court cited Winter, but Winter actually supports Plaintiffs here.

Winter suggested that "computer software" may be subjected to products liability just like other "highly technical tools[.]" Winter v. G.P. Putnam's Sons, 938 F.2d 1033, 1035-1036 (9th Cir. 1991); Schafer v. State Farm Fire & Cas. Co., 507 F. Supp. 2d 587, 601 (E.D.L.A. Aug. 22, 2007) ("courts and legal scholars" alike rely on Winter to suggest that "computer software may give rise to strict products liability in tort"); RESTATEMENT (THIRD) OF OF TORTS: PRODUCTS LIABILITY, §19.

***Fourth***, Winter was applying the Restatement, but California strict-products-liability is governed by Greeman-Escola, not the Restatement. E.g., Barker, 20 Cal.3d 413, 426 n.8 (1978) (The "Restatement's language is potentially misleading […] We agree [.]"); Price, 2 Cal.3d 245, 250-251 (1970) ("[W]e extended […to] a category not covered by the Restatement[…]"); Bolger, 53 Cal.App. 5th 459 ("Our Supreme Court […] **has not hesitated to disagree with the Restatement**[…]").

## CONCLUSION

This appeal pertains to extremely powerful technology—that's highly destructive when wielded without precautions.

Here, children died. That result wasn't just foreseeable. It was foreseen. It was also easily preventable, had warnings by Defendant's own experts been heeded. Two modest changes would have avoided death: a meaningful warning to a vulnerable girl or some restraint from exercising the technology's full power upon her.

In extinguishing these claims, the District Court made error after error on the merits while failing to abide its limited jurisdiction – erring on the jurisdictional statute, the Article III diversity requirement, the Article III injury-in-fact requirement, all while resting its analysis under "prior analysis" that examined the wrong complaint.

This Court should correct these errors: it should vacate on jurisdiction, reverse on §1332(d)(3)-(4), and reverse on jurisdictional discovery (Section I). It should reverse on survivor-limitations and wrongful-death standing (Section II). And, it should permit amendment, or reverse on duty-of-care and strict-products-liability (Section III).

Date: September 9, 2026

Respectfully submitted,

DIGITAL JUSTICE FOUNDATION

*/s/ Andrew Grimm*
Andrew Grimm
DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive
Omaha, Nebraska 68154
(531) 210-2381
Andrew.B.Grimm@Gmail.com

*Attorney for Appellants*

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, the undersigned hereby certifies that there are no related cases:

a. There is no other case pending in this Court that arises out of the same case in the District Court that the undersigned is aware of.

b. There is no other case pending in this Court raising the same or closely related issues that the undersigned is aware of.

c. There is no other case pending in this Court involving the same transaction or event that the undersigned is aware of.

Date: September 9, 2026

Respectfully submitted,

*/s/ Andrew Grimm*
Andrew Grimm

## FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 25-7760

I am the attorney or self-represented party.

**This brief contains 13,937 words,** including 20 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.

[ ] a party or parties are filing a single brief in response to multiple briefs.

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Andrew Grimm* **Date** September 9, 2026

*(use "*s/[typed name]*" to sign electronically-filed documents)*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate ACMS.

Date: September 9, 2026

Respectfully submitted,

*/s/ Andrew Grimm*______
Andrew Grimm